[Civ. No. 10543. Third Dist. Oct. 24, 1963.]

MITZI MARTINEZ, a Minor, etc., Plaintiff and Respondent, v. BENJAMIN REX MOORE et al., Defendants and Appellants.

McLaughlin & Russell, Bronson, Bronson & McKinnon and Ernest M. Thayer for Defendants and Appellants.

J. Adrian Palmquist, Anthony J. Scalora and Frances J. Cornish for Plaintiff and Respondent.

VAN DYKE, J.*—When Mitzi Martinez, a minor, plaintiff-respondent here, was 3 years old she lost her right eye. Through her mother as guardian *ad litem* Mitzi brought this action to recover damages. She obtained a judgment for $150,000 against defendants-appellants, Benjamin Rex Moore and Vivian Moore, individually, and doing business as Rex Moore Company, a copartnership. The Moores appeal.

Joseph French and Lois French owned an apartment house in Sacramento. On July 13, 1958, some electric wires burned out in the apartment and the lights went off. The Frenches called the Rex Moore Company to arrange for repairs. The Frenches met with Rex Moore, three men from the Sacramento Municipal Utility District, called "SMUD," and a city inspector and discussed what had to be done. The inspector demanded that the whole apartment building be rewired to comply with local ordinances, and a representative of SMUD insisted that electric meters be installed for each unit.

The responsibility for installation of meters is divided between SMUD and the building owner. SMUD furnishes and installs its own meters, but the owner is required to put in the meter panel and do the wiring. SMUD indicates the location of the meters. Here, one Carboni, a SMUD representative, went to the apartment house and marked a wall for the placement of the panel. The place chosen was located on a wall at right angles to the wall containing the back door of the apartment in which the Martinez family lived. Rex Moore Company installed the panel in the marked

---

*Retired Presiding Justice of the District Court of Appeal sitting pro tempore under assignment by the Chairman of the Judicial Council.

location, and thereafter SMUD installed the meters. The panel was so located that when the back door of the Martinez apartment was fully opened the glass panel in the top half of the door would strike the meter cases which protruded about 6 inches from the surface of the panel. On September 21, 1958, Mary Martinez, the mother of Mitzi, went to San Francisco, leaving Mitzi in the care of a babysitter. The manager of the apartment house visited the Martinez apartment, talked with the sitter and left through the back door. The sitter followed her through the door, pushing the door back behind her while she talked further with the manager. Mitzi and her sister were pushing against the door from the inside. The sitter was leaning against the door from the outside. When the manager was leaving the sitter moved away from the door, it flew open and against the meters. The glass in the door broke and a piece fell and entered Mitzi's right eye. She was taken to the hospital where her eye was removed. She was subsequently fitted with an artificial eye.

On appeal the following contentions are made: (1) that though no evidence was introduced showing a violation of a portion of a Sacramento building ordinance governing the installation of meters, nevertheless the court read the pertinent parts of the ordinance to the jury and instructed that a violation of the ordinance was negligence; (2) that plaintiff's attorney was guilty of misconduct in arguing to the jury; and (3) that the trial court erred in permitting over objection the testimony of a witness who, some 15 years prior to the trial, had suffered the loss of his right eye. The witness was permitted to describe the pain, discomfort and visual inefficiency of one in such a situation.

The complaint specifically charged violation of the ordinance by the manner in which the meter panel had been installed by Rex Moore Company. The pertinent part of the ordinance provided that the mounting height of meters when installed in a cabinet or switchboard should not be over 8 feet or less than 12 inches above the floor level; that the mounting height when located adjacent to walkways or driveways should not be over 8 feet or less than 6 feet above such level. It was clear from the evidence that the meter panel had been installed at such a height above the floor as to cause the glass panel in the door to contact the protruding meter boxes when the door was fully opened. No precautions were taken to prevent such contact, such as the installation of a doorstop. There was no direct testimony or proof as to the height above the floor of the panel and switch cases, nor of the height above

the floor of the glass panel on the door. There was thus no specific proof of the violation of the ordinance. However, one cannot read the full record with gaining the definite impression that had the ordinance not been violated, that is, had the panel been installed 6 feet above the floor level, or more, the accident would not have happened. It appears likely that the want of the specific proof was caused through oversight. Although not specifically offered and received in evidence, there was used in connection with the testimony of witnesses a pasteboard "mockup" purporting to show the floorline, the wall on which the panel was installed, the wall enclosing the door, and the location of the glass panel in the door. The mockup bore a legend that it was drawn to the scale of 6 inches to one foot. If that scale were accepted, it showed a door 2 1/2 feet wide, 6 1/2 feet high, and hung slightly above the floor level. It showed the meter panel entirely below a level 6 feet above the floor and squarely opposed to the glass panel in the door when the door was open. Although witnesses talked about the situation as compared to the mockup, no one took pains to prove the accuracy of the mockup nor to introduce it in evidence as having been used in connection with the oral testimony. The jury could well conclude that the installation of the panel and of the switch cases within the panel, as was done, was negligence because the normal use of the door would be apt at some time to bring the glass panel in contact with the protruding meter cases. It is not argued here that the verdict is not supported by the evidence in that aspect.

It was said in *Davenport* v. *Stratton*, 24 Cal.2d 232, 254 [149 P.2d 4], that "Even though an instruction is couched in proper language it is improper, if it finds no support in the evidence, and the giving of it constitutes prejudicial error if it is calculated to mislead the jury." In view of the state of the record it was error to instruct on the ordinance and reversal must follow unless it can be said that the error was not prejudicial. The proof of negligence and of proximate cause, without regard to the ordinance, was clear. Though the court instructed on the ordinance, it also instructed fully on the subject of negligence without regard to ordinance violation. It is difficult to believe on this record that a different result would have been reached by the jury had the ordinance instructions not been given, and it is equally difficult to believe that the giving of the ordinance instructions affected the award of damages. It must be said, however, that the

jury in all probability gave considerable attention and attached considerable weight to the matter of ordinance violation for, after being out an hour, the jury returned to the courtroom and asked the court to "re-read those portions of the code which were applicable to the placing of the panel." A poll of the jury disclosed that one juror replied the verdict was not his, but, of course, the ground of the juror's dissent is not shown. Although the verdict was large, we cannot say that, as modern verdicts go, the damages were excessive.

From a reading of the entire record there appears to have been no issue as to the approximate height above the floor at which the panel had been installed or as to the installation as made having been in violation of the ordinance, that is, less than 6 feet above the floor level. There was no testimony that the installation in the matter of height conformed to the ordinance requirements, but it seems to have been tacitly assumed that the ordinance had been violated. Using the mockup in the examination of a witness, the following occurred: (Respondent's attorney.) "Q. It is fifty-two inches from the floor line to the bottom of this glass." (The scale of the mockup per the legend written on it is 6 inches to 1 foot, but there was no testimony this was correct. The mockup by this scale shows the meter at the height of about 52 inches.) Again in examining a witness, respondent's attorney first stated that the meters were only 52 inches from the floor, and then asked: "If that had been installed with these meters at the minimum height according to the rule of the Sacramento City Ordinance, this accident would not have happened, would it? A. Likely not. Q. Why was this installed below the minimum height, can you tell me? A. No, sir."

██ Appellants contend that plaintiff's attorney was guilty of misconduct during argument. As has been said, a representative of the utility district, SMUD, marked the spot on the wall where the panel to receive the meters should be installed, and counsel for appellants argued that SMUD was responsible and solely responsible for the accident and should have been made a party to the case. The following occurred: Counsel for appellants said, "So there could be no question whatever that this panel was placed exactly where SMUD directed it to be placed, nor can there be any doubt whatever that the meters themselves were installed by SMUD employees and until that occurred, there was no hazard whatever. Until the SMUD employees put meters in those sockets, there was no danger. So the suggestion is made that I am bringing a red herring before this jury to bring up and discuss

SMUD. I will, ladies and gentlemen, I will ask why isn't SMUD here? They are the ones that created the actual hazard, the ones that directed where the meter panel was to be placed, the ones that put in the meters themselves, that created the hazard. Mr. Palmquist anticipated that argument. But this isn't the red herring he suggests. He felt it wise to prepare you for the argument and to scoff at it before it was made. For this reason, he said, 'Of course, Mr. McLaughlin is arguing he should [not] be held responsible, his client shouldn't be held responsible for his client's negligence just because SMUD was negligent also.' Ladies and gentlemen of the jury, I am not arguing that. I am arguing that the partners of the Moore electrical company and their employees were not negligent, and that the negligent parties were SMUD, and I am asking again why they are not sitting in this courtroom. Mr. Palmquist attempted to explain that and he says, 'Well, plaintiff has what is known as the plaintiff's choice. If there are seven or eight negligent parties,' he said, 'plaintiff can select the one or two they decide to sue and the defendant cannot complain.'

"The answer to that, a defendant cannot claim, 'I am negligent, but the other party was negligent, so let me off,' but the defendant can definitely state, 'I am not negligent, but a party who is not before this court is the negligent party.' We have pinpointed that negligent party. We have shown who it is. . . ."

In his closing reply counsel for respondent said, "SMUD is like the city of Sacramento. You may not realize this, but we have had, down through hundreds of years, certain doctrines that are still used. One of those old doctrines was that the King could do no wrong. Sacramento Municipal Utility District is part of the King. The city of Sacramento is part of the King."

There was no assignment of misconduct. The court instructed the jury fully upon the question of necessary and proper parties to actions, telling the jury that when the negligent acts or omissions of two or more persons, whether committed independently or in the course of jointly directed conduct, contribute concurrently and as proximate causes to the injury of another, each of such persons is liable, and this is true regardless of the relative degree of the contribution; that it is no defense for one of such persons that some other person not joined as a defendant in the action participated in causing the injury, even if it should appear that the negli-

gence of that other person was greater in either its wrongful nature or its effect.

Appellants' counsel says in the opening brief, "For reasons best known to himself, plaintiff's attorney chose to neglect SMUD in this lawsuit. This, of course, he was perfectly entitled to do. However, this in attempting to answer defendants' attorney, and to explain this oversight, counsel for plaintiffs [sic] attributed SMUD's absence to the doctrine of sovereign immunity. Defendants objected, and were overruled by the court."

In view of the court's correct and complete explanation of one complete reason why SMUD was not joined and the court's instructions that whether SMUD was joined or not was immaterial to any defense of the Moores, we think the argument as to sovereign immunity could not rise to an importance that would justify ascribing it as misconduct; and we think further that even should we so hold, we could not say on this record that injury flowed therefrom.

■ Finally, appellants claim error in that over objection the court received incompetent, irrelevant and immaterial evidence with regard to damages by receiving the testimony of a man who had suffered constant pain for 15 years following the loss of his right eye at age 37. Mitzi had testified that she suffers no pain, even though her mother is required frequently to remove the artificial eye and wash it and put it back. Her doctor testified she did not suffer pain while in the emergency room at the hospital, and her mother testified that she complained of pain only "once in a great while." The witness was one Maisch who was a line foreman for Pacific Gas & Electric Company for whom he had worked some 24 years. He said that about 15 years before the trial, at his attained age of 37, he had suffered an on the job injury when a gas main exploded, and as a result his right eye had been surgically removed. He testified that it always hurt and that the artificial eye, while in place, felt something like "putting your finger in your eye" and that while it was out it did not feel any better. He said he did not go hunting anymore because he had been unable to retrain himself to bring his gun to his left shoulder after 37 years of shooting from the right. He further testified that in the 15 years he had worn an artificial eye he had not learned to compensate for a lack of ability to judge distance; that in driving an automobile he had difficulty from this same deficiency; that when his wife drove and he rode with her he was scared "to death" be-

cause she seemed to be taking chances that looked to him dangerous and he had the same experience when others were driving; that when cars stopped in front of him it was difficult to know just how close he was to the forward car; that he had had to buy five artificial eyes in 15 years; that the acids in the system worked on the eyes and necessitated replacement; that he had given up swimming because in diving if he dropped the lower lid the artificial eye would come out; that the loss of depth perception rendered it difficult in fishing mountain streams, since he miscalculated the distance of jumps he was required to make from one rock to another; that he was unable to thread a needle; that upon replacing his eye, as in the morning, either heat or cold would cause excessive running of the tear ducts in order to warm it up or cool it down; that these tears ran down his cheeks and he had to wipe them off; that his field of vision was restricted in that he could see objects to the left but not to the right without turning his head and that constituted a distinct disadvantage in driving, since he had to turn his head to look around; that he had to clean the eye every day as a part of his morning chore and that to keep down infection he had to use ointments; that a sort of crusty material formed around the artificial eye necessitating frequent washing and causing the eye to be painful until that was done; that while he got used to having only one eye, he thought that people looked at it and it made him conscious of being a one-eyed man; that he was always conscious that if he lost the remaining eye he would be totally blind, as he put it, "I'm tapping my way around," and that he had thought of that; that being without an eye interfered with job seeking. It is to be noted that the greater part, by far, of the testimony of this witness as to the damaging effect of the loss of an eye was a matter of common knowledge, or can be deduced from those things that are. Speaking generally, it would be permissible to argue these things to a jury without placing testimony in the record about them. We think that it would have been a matter of greater propriety to have omitted the testimony of this witness, but we are satisfied that no harm was done by using the witness to call these things to the attention of the jury rather than by presenting them as argument.

■■■ We think that in the discussion of the error in instructing upon the ordinance we must eliminate as immaterial any discussion of the alleged misconduct of counsel and the matter of the testimony as to deficiencies of vision, and

the like, consequent upon the loss of an eye. So looked at, we do not hesitate to say that the error in respect to the ordinance does not justify reversal in view of the constitutional mandate on reversals. (Cal. Const., art. VI, § 4½.)

The judgment is affirmed.

Schottky, J., concurred.

PIERCE, P. J.—I concur in the conclusion and in all of the reasons therefor as expressed in Justice Van Dyke's opinion, except that I do not agree that the trial court erred in instructing the jury regarding ordinance prescribing the minimum height for meters and the effect of its violation. The portions of the record pertinent to this question have been fairly stated in the foregoing opinion.

The mockup, scale of which was shown thereon, showed the door to be of standard 6-foot 6-inch height, and when opened and in juxtaposition to the meter panel (also included in the mockup), the meter is demonstrated to be well below 6 feet. Although not formally introduced in evidence, the mockup with its scale was before the jury, failure to put it formally in evidence was clearly an oversight, questions were framed and answers given upon the assumption that the mockup was accurate and that the height of the meter was below six feet; no contention otherwise was made. Nor were any objections made to the use of the mockup nor to questions asked which effectually assumed it to be a part of the evidence in the case. I would hold that appellant is estopped to complain of the omission on this appeal (in fact would have been estopped to complain of the instruction ex post facto in the trial court), which holding I conceive to be a proper application of the rule that "where the existence of certain facts is assumed in the trial court and the trial proceeds, without objection, on that assumption, and the case is decided in reliance thereon, neither party will be heard in the court of review to question there, for the first time, the existence of the facts, and especially not where the alleged omissions might have been supplied if called to the attention of the trial court." (*Brown* v. *Gurney,* 201 U.S. 184, 190 [26 S.Ct. 509, 50 L.Ed. 717, 720-721]; see also 5 Am.Jur.2d, § 710, pp. 155-156, and cases cited.)

A petition for a rehearing was denied November 18, 1963, and appellants' petition for a hearing by the Supreme Court was denied December 18, 1963.