[No. 39855. Department One. November 6, 1969.]

CURTIS HOGENSON, *Respondent*, v. SERVICE ARMAMENT CO., INC., *Appellant.*\*

\*Reported in 461 P.2d 311.

 

*Trethewey, Brink & Wilson,* by *Daniel Brink,* for appellant.

*Reed, McClure & Moceri,* by *Roy J. Moceri* and *William R. Hickman,* for respondent.

FINLEY, J.—This is an action for personal injuries, the almost total loss of eyesight in one eye, which occurred when plaintiff was firing an old rifle using ammunition salvaged from the Spanish-American War and subsequently sold to plaintiff by defendant. The action was based on both negligence and breach of warranty. The jury in the trial court awarded damages to the injured party for $130,000. This appeal followed.

Curtis Hogenson was something of a gun buff. He already had two rifles and a shotgun when he saw an advertisement in a gun magazine offering for sale a .43 caliber Remington Rolling Block rifle. He ordered the rifle which had been manufactured in 1879 and used by an Argentine police force until shortly before its resale. Several months later, in response to Service Armament's advertisement in American Rifleman Magazine, he purchased 200 rounds of .43 caliber ammunition. He fired a number of rounds without mishap. On July 17, 1965, Hogenson went with a friend to an area near Tacoma for target practice. When he fired the second round of the day, something hit him in the right side of his face. Although the surrounding facial area was not harmed, he suffered extremely serious injury to his right eye.

Plaintiff's theory of the injury requires a somewhat detailed understanding of how the "rolling block" works. Two heavy metal blocks pivoting on steel pins comprise the

REMINGTON ROLLING BLOCK

action. (See diagram.) The forward block is the breech-block. It contains the firing pin and when moved forward and closed it holds the ammunition in the cartridge chamber of the rifle. The other steel block to the rear of the first block contains the hammer. When it goes forward, as in firing the gun, a portion of it rolls under and behind the breechblock forming a lock which normally prevents the breechblock opening during firing. It was plaintiff's contention during trial that on the occasion in question the cartridge was defective, allowing the primer to vent back against and alongside the firing pin. This in turn pushed the hammer block back into a cocked position, allowing the breechblock to rotate back and the cartridge to come back into plaintiff's eye with extreme force. (See diagram.)

The lengthy history of the .43 caliber ammunition supplied by Service Armament Co. gradually unfolded at trial. It had been manufactured in Spain in the last two decades of the nineteenth century, was sent to Cuba and was eventually captured by the United States during the Spanish-American War. It was sold to a Mr. Francis Bannerman, the

REMINGTON ROLLING BLOCK

ancestor of the third party defendant. For years it was kept in a damp concrete storage bunker on an island in the middle of the Hudson River. In 1959, Service Armaments purchased about 200,000 rounds of the ammunition for $200. Much of the ammunition was so badly corroded that it was not possibly salable and was scrapped. Some of the remaining ammunition was resized, using a power die, to compress the brass shell casings to fit the rolling block .43 caliber rifle. No notice was given to customers of the age of the powder and primers, the possibility of corrosion, or the fact that the shells had been reprocessed as indicated rather than reloaded.[1]

Appellant, Service Armament, contends that the jury verdict was so excessive as to constitute error resulting from passion or prejudice. Error is assigned to the refusal of the trial court to admit as evidence a letter written by plaintiff's counsel which gave notice of breach of warranty.

Service Armament contends that the letter written by Hogenson's attorney shortly after the accident should have

---

[1] The "resizing" operation left marks similar to those found on reloaded cartridges.

been accepted by the trial judge as an admission. The letter reads as follows:

August 2, 1965

Service Armament Company
689-R Bergen Boulevard
Richfield, New Jersey 07657
 Re: Curtis Hogenson

Gentlemen:

We are attorneys for Mr. Curtis Hogenson of 27641 Pacific Highway South, Kent, Washington. On March 8, 1965, Mr. Hogenson sent you an order for 200 rounds of .43 Spanish ammunition and paid for the same. The ammunition was received by him on or about May 28, 1965. Thereafter, on July 17, 1965, while using this ammunition in a Remington Rolling-Block rifle (Spanish .43 rifle), the cartridge, while exploding, left the chamber, striking his right eye and permanently injured the vision of his right eye. Preliminary investigation indicates that the accident was due in part to premature firing of the primer and defective cartridge.

You are hereby placed on notice of breech [sic] of warranty on your part in that the cartridge in question was not fit for its intended use and was not of merchantable quality. Please be advised that Mr. Hogenson will hold you responsible for all damages caused thereby.

Would you please advise us the name of the company who loaded the cartridges in question.

 Very truly yours,
 BATEMAN, REED, McCLURE & MOCERI
 Roy J. Moceri

RJM:q

Via Registered Airmail
 Return Receipt Requested
cc Mr. Curtis Hogenson

Appellant contends that the sentence suggesting that the accident may have been due to premature firing of the primer was inconsistent with plaintiff's later theory of how the injury occurred.

■ This court has long held that "[a]n admission by an attorney to be binding upon his client must be distinct and formal, and made for the express purpose of dispensing with the formal proof of some fact at the trial." *State v. Wheeler,* 93 Wash. 538, 161 P. 373 (1916). *See also Dodge v. Stencil,* 48 Wn.2d 619, 296 P.2d 312 (1956). The sentence here involved was clearly not intended to be binding but rather was gratuitous information included in the notice of breach of warranty. The language of the sentence—"Preliminary investigation . . . due in part . . ."—indicates the tentative and casual nature of the statement. It is neither distinct nor formal nor intended to dispense with the formal proof of a fact at trial. It was not intended as a stipulation or as a formal pleading.

There have been two theories by which the statements of attorneys have been attributed to their clients. Some courts speak in terms of adoptive admissions; others prefer a more traditional agency analysis. *See* E. Morgan, Basic Problems of Evidence 274 (1962).

There is no proof that the plaintiff knew or had heard about the letter under circumstances which would lead one to think that he had adopted it as an admission made by his counsel. Any implied agency was at most for the purpose of giving the required notice of breach of warranty and not for the purpose of making additional gratuitous statements. Realistically, the opposing party should not have relied on tentative statements in the letter.

> [W]here the nature and circumstances of the utterance are such that the court and opposing counsel are not reasonably justified in relying thereon as upon a solemn admission intended as such, the utterance is not binding upon counsel making it or upon his client.

2 B. Jones, Evidence § 957 (J. Henderson ed. 1926). *See also* Morgan, *Admissions,* 12 Wash. L. Rev. 181, 188 (1937): "The courts appear to be reluctant to charge a party with any but formal deliberate declarations of the attorney." We think the letter was properly excluded.

■ Appellant assigns error to the failure of the trial court to submit the defense under the maxim "volenti non

fit injuria" to the jury. The defense under the "volenti" maxim has been discussed in many previous opinions of this court. *See Walsh v. West Coast Coal Mines, Inc.,* 31 Wn.2d 396, 197 P.2d 233 (1948); *Martin v. Kidwiler,* 71 Wn.2d 47, 426 P.2d 489 (1967); *Detrick v. Garretson Packing Co.,* 73 Wn.2d 804, 440 P.2d 834 (1968); *Regan v. Seattle,* 76 Wn.2d 501, 458 P.2d 12 (1969). It is closely related to but distinct from the defense of assumption of risk.[2] The maxim "no wrong is done to one who consents" implies knowledge. The inquiry is whether the risk is known and appreciated and, if so, did the plaintiff voluntarily consent to expose himself to it. The burden of proof is upon defendant to establish the elements of the defense. Whether he has successfully done so is normally a question for the jury. *See Detrick v. Garretson Packing Co.,* 73 Wn.2d 804, 809, 440 P.2d 834, 837 (1968). However, before it can properly be submitted to the jury there must be at least some evidence introduced indicating that the plaintiff knew of the specific character of the risk, which if known might have caused him to reevaluate his voluntarily entering into the risk-creating situation. In other words, the defense requires more than a generalized feeling that there may be some hazard involved. To illustrate, one who attends a baseball game may be precluded from recovering for damages suffered when hit by a ball or broken bat. *See, e.g., Kavafian*

---

[2]This distinction has been strongly criticized. *See* W. Prosser, Torts 450 (1964); Note, 41 Wash. L. Rev. 585 (1966). Professor Prosser argues that all of the defenses similar to volenti should be characterized as various subtypes of the general category of assumption of risk. In so doing, he is substituting one set of categories for another, with only a semantical difference. If adopted it could lead to continued confusion over what "type" of assumption of risk is being utilized.

One example or, more precisely, one gradation of this defense, implied consensual acceptance of a risk, known or unknown, has been virtually eliminated in this state by our decision in *Siragusa v. Swedish Hosp.,* 60 Wn.2d 310, 373 P.2d 767 (1962), involving a master-servant relationship. *See also Feigenbaum v. Brink,* 66 Wn.2d 125, 401 P.2d 642 (1965). However, assumption of risk retains validity when there is an express voluntary agreement to assume. To avoid confusion this court has used the maxim "volenti non fit injuria" to describe what might be considered still another type of assumption of risk: the voluntary assumption of a *known* risk.

*v. Seattle Baseball Club Ass'n,* 105 Wash. 215, 177 P. 776, 181 P. 679 (1919). This preclusion may apply even if the circumstances leading to the injury were somewhat bizarre. He would not be precluded from recovering for damages from a collapsing grandstand or from eating tainted concession food unless he knew of this specific risk and voluntarily accepted these risks.

In the instant case the plaintiff may well be held to have been aware of a generalized hazard involved in firing old guns. There was no evidence indicating that he was aware of the further specific hazard of firing cartridges of the age and condition involved. Had he been aware of this risk he may well have reevaluated his decision to engage in target practicing on the day in question. But not only was there no evidence that he had such knowledge, but to the contrary, the evidence indicated that he believed the shells had been reloaded.

We considered the doctrine of volenti most recently in *Regan v. Seattle,* 76 Wn.2d 501, 458 P.2d 12 (1969). The plaintiff in that case was also engaged in a hazardous pastime ("go-cart" racing). We held that just because the plaintiff may have been aware of a generalized hazard, does not necessarily mean that he assumed "an extraordinary risk" from spilled water on the race track which he may or may not have known about. As we stated in that case, "[i]n order for the 'volenti' doctrine to be applicable, plaintiff must have voluntarily exposed himself to a known and appreciated danger." *Regan v. Seattle, supra,* at 507. When there was no evidence introduced that the plaintiff was aware of the factors leading to the "extraordinary risk," a volenti instruction would be singularly inappropriate.

■ Service Armament further contends that comments by the presiding judge and by counsel for plaintiff prejudiced the jury against defendant and that this prejudice is shown by the excessive damages awarded. However, no objection or complaint about these statements was made at trial. We have repeatedly held that "the remedy for mis-

conduct on the part of anyone during the progress of a trial is to call the attention of the presiding judge to the alleged misconduct and move by some proper procedure to have the matter corrected." *State v. Smails,* 63 Wash. 172, 115 P. 82 (1911); *Kasey v. Suburban Gas Heat Inc.* 60 Wn.2d 468, 374 P.2d 549 (1962).

There may be instances of misconduct which would be so flagrant and prejudicial that they could not be corrected. The misconduct in this instance, if any in fact occurred, does not rise to this level. In his memorandum in support of a motion for a new trial counsel for Service Armament significantly indicated one reason why arguments by opposing counsel are generally not considered prejudicial:

Most jurors are sufficiently sophisticated to be able to recognize comments of counsel as not being evidence, perhaps being histrionics, and not as evidence, and not as anything that would have any effect or impact upon them.

█ The test to be applied on the issue of excessive damages was set forth in *Kramer v. Portland-Seattle Auto Freight,* 43 Wn.2d 386, 395, 261 P.2d 692, 697 (1953):

On the one hand, the following must be considered: Each cause depends, to a large extent, upon its own facts and circumstances. The verdict must be compensatory of a pecuniary loss. *Walters v. Spokane International R. Co.,* 58 Wash. 293, 108 Pac. 593 (1910). It can be substantial (*Atkeson v. Jackson Estate,* 72 Wash. 233, 130 Pac. 102 (1913); *St. Germain v. Potlatch Lbr. Co.,* 76 Wash. 102, 135 Pac. 804 (1913); *Skeels v. Davidson,* 18 Wn.(2d) 358, 139 P.(2d) 301, 149 A.L.R. 225 (1943)) but not out of proportion to actual damages. *Halverson v. Seattle Electric Co.,* 35 Wash. 600, 77 Pac. 1058 (1904). The amount of the damage is within the discretion of the jury, under proper instructions. The jury is given considerable latitude in making such determination as to it seems just. *Aronson v. Everett,* 136 Wash. 312, 239 Pac. 1011 (1925); *Ticknor v. Seattle-Renton Stage Line,* 139 Wash. 354, 247 Pac. 1 (1926). The subject matter being difficult of proof, it cannot be fixed with mathematical certainty by the proof. Once the determination is made, an appellate court will give great weight to, and is reluc-

tant to interfere with, the jury's verdict. *Kellerher v. Porter,* 29 Wn.(2d) 650, 189 P.(2d) 223 (1948).

On the other hand, the balancing factor is the conscience of the appellate court, when there is an affirmative showing that passion and prejudice played no part in the jury's determination. Is the amount flagrantly outrageous and extravagant? Is it unjustified in the light of the evidence? Does it disclose circumstances foreign to proper jury deliberations? If it is and does, then it can be said to shock the sense of justice and sound judgment, and the verdict of the jury is excessive.

This test has subsequently been followed in *Fosbre v. State,* 70 Wn.2d 578, 424 P.2d 901 (1967); *Adams v. State,* 71 Wn.2d 414, 429 P.2d 109 (1967).

█ It is very difficult to assess in monetary terms the damage caused by the functional loss of one eye. We are convinced, however, that the amount here involved is not an unrealistic appraisal of the damages sustained. Since there was no significant evidence indicating that passion and prejudice played any part in the jury's determination, the test to be used is the conscience of the appellate court. In assessing this factor, it is of some interest to look at comparative judgments which have been appealed in other states. In recent years verdicts have been upheld which are comparable to the one here in question. *See, e.g., Martinez v. Moore,* 221 Cal. App. 2d 516, 34 Cal. Rptr. 606 (1963) ($150,000 for loss of one eye); *Rivers v. Leitman,* 317 F.2d 102 (4th Cir. 1963) ($140,000 for loss of one eye); *Kavanagh v. Butorac,* 221 N.E.2d 824, (Ind. App. 1966) ($100,000 for loss of one eye and psychological trauma).

The amount of the verdict is further substantiated by the record of this case. Neither the record nor the size of the award indicates that the jury was influenced by any of the allegedly prejudicial argument and comment. It does not shock our sense of justice and sound judgment.

The verdict and judgment thereon are affirmed.

HUNTER, C. J., WEAVER and McGOVERN, JJ., and DONWORTH, J. Pro Tem., concur.