[No. 41479. En Banc. December 24, 1970.]

JULIUS G. JOHNSON et al., *Petitioners,* v. MARSHALL FIELD & COMPANY, *Respondent.**

*Ralph B. Potts* and *Sten H. Dagg,* for petitioners.

*Reported in 478 P.2d 735.

*William R. Lanthorn* and *Leo A. Anderson,* for respondent.

McGovern, J.—February 16, 1970, this court granted plaintiffs' petition to review a decision of the state Court of Appeals, which had affirmed the trial court in this matter. *See* 1 Wn. App. 655, 463 P.2d 645 (1969).

The record reveals the following situation. In their amended complaint, plaintiffs alleged that the wife, Willabelle Johnson, while a customer in defendant's store, was riding on an escalator and was injured through defendant's negligence. Plaintiffs also claimed that after the escalator was stopped, Mrs. Johnson was not given proper care and attention by defendant's employees, although she was in fear of bleeding to death and was begging for help. The prayer of the complaint was for $60,000 general damages and $1,500 special damages.

Several months prior to the trial, plaintiffs filed a notice of trial amendment which stated:

> PLEASE FURTHER TAKE NOTICE that the plaintiff will insert a separate paragraph listing the negligence of defendant, Marshall Field & Co., d/b/a Frederick & Nelson, a Washington corporation, in addition to the negligence which was the proximate cause of the accident on the escalator in failing to use proper and reasonable care of the injured plaintiff after the accident as follows:
>
> 1. In failing to immediately call a Doctor, although literally dozens were available within a few hundred feet.
>
> 2. In failing to use proper care in giving first aid due to the wounds of plaintiff and exposing the plaintiff to untrained personnel who caused the plaintiff severe pain by jabbing her opened scalp and exposed skull.
>
> 3. In failing to immediately call an ambulance, after refusing to call a Doctor and in treating plaintiff discourteously and inhumanly thereby rendering her more nervous and making her hysterical, each of which acts of negligence contributed to the pain and agony of the plaintiff and to her disability, both temporary and permanent.

After trial, the jury returned the following verdict:

We, the jury in the above-entitled cause, do find for the plaintiffs in the sum of $ *0* as to their first cause of action, and in the sum of $*20,000* as to their second cause of action.

Defendant thereafter moved for judgment n.o.v. or, in the alternative, for a new trial on eight of the nine grounds stated in CR 59. The motion was argued on May 26, 1967, and again on September 8, 1967. On each occasion the trial court orally stated its reasons for its decision to grant a new trial on the second cause of action unless the plaintiffs within 10 days thereafter elected to accept a reduced award of $2,500.

October 24, 1967, the trial court entered its order granting defendant a new trial unless the plaintiffs should consent to a reduction of the verdict from $20,000 to $2,500. Plaintiffs elected not to consent to the trial court's reduction of the verdict and appealed from its order conditionally granting a new trial as to the second cause of action. The Court of Appeals affirmed the action of the trial court. We, however, reverse.

Plaintiffs first challenge the authority of the trial court to grant the defendant a new trial upon the grounds of passion or prejudice, RCW 4.76, and under the governing Civil Rules for Superior Court, CR 59 (f), formerly Rules of Pleading, Practice and Procedure 59.04W.

While the order of October 24, 1967, which granted the defendants a new trial on the second cause of action did not specifically state whether the order was based "upon the record or upon facts and circumstances outside the record which cannot be made a part thereof", as required by CR 59 (f), the record otherwise indicates that it was based upon matters in the record. We treat it accordingly and find that the assignment of error has merit.

Despite the trial court's general statement that "the amount of the award indicates passion and prejudice", other statements by the court clearly indicate that passion or prejudice did not result from anything that may have

occurred during the course of the trial. The trial judge said:

Now, it would be difficult for me to say and perhaps impossible—I must be fair to Mrs. Johnson—probably impossible for me to say that twenty thousand dollars is so excessive as to unmistakably indicate passion and prejudice . . .

. . . I think that in fairness I must say that there was nothing in the trial or argument to the jury that was in any way subject to criticism or that was designed to encourage passion or prejudice.

Our extensive examination of the record also fails to disclose anything that occurred during the course of the trial that might reasonably be said to have unfairly resulted in passion or prejudice detrimental to the defendant's cause, nor has counsel for defendants directed our attention to any such prejudicial matter. The trial court therefore committed error in granting a new trial on the grounds of passion or prejudice in the record.

Plaintiffs' remaining assignments of error challenge the trial court's second basis for granting a new trial, *i.e.*, the failure of substantial justice because of an excessive verdict not justified by the evidence. The trial court's order stated:

The amount of the award was such that the court was and is shocked by the amount. Such an amount cannot be justified. It is a gross miscarriage of justice. *There was no testimony by any medical witness that the care and attention subsequent to the accident in any way contributed to the injuries or inhibited the plaintiff's recovery from those injuries. Three doctors were called and there was no testimony that the defendant's care and attention was improper.*

(Italics ours.)

It must be pointed out that plaintiffs' second cause of action was not predicated solely upon the ground that the defendant's failure to provide adequate care and attention for Mrs. Johnson after the accident contributed to the injuries or that they inhibited her recovery from those injuries. Nor was medical testimony necessary—it would have added nothing to plaintiff's claim on the second cause

of action. The testimony of Mrs. Johnson alone was obviously accepted by the jury when it awarded her a $20,000 verdict, and her testimony was sufficient to support that verdict.

Plaintiff's testimony as it related to her second cause of action was as follows:

Q. [By Mr. Potts] All right. Now, you mentioned a post. About how long was it, can you estimate, after your head was hit against the steps coming down, that you got over to the post? Can you give any estimate of time? A. [By Mrs. Johnson] Well, I would think it was somewhere between four and five minutes, because it took them quite awhile—three minutes to get us off of the escalator, and then I went over to the post, and I eased myself to the floor, but I stayed there a long time. I stayed there about from ten to fifteen minutes without any help. I was screaming for an ambulance in every other word. Nobody paid much attention to me. Q. What happened after that? A. Well, then after that some—some men came over to lift me up off the floor, and then they guided me over, and one of them turned me around, and another one gave me a push in the chest towards the wheelchair, because I couldn't see anything, and then when I got into the wheelchair, why somebody else wheeled me somewhere to an elevator, a freight elevator that took me up some place, and then they wheeled me out of the freight elevator, and then everything was—nobody paid— touched me or anything all this time. Suddenly there was a man that grabbed my hands and held them down in front of me, and I blinked away the blood, and they were dirty hands; they were like he was working or something, and I saw a smock on him, and the smock looked kind of dirty to me, too. I told him he had no right to hold my hands; I wasn't violent. Nobody talked to me; nobody said anything. He just held my hands there. The nurse kept wadding something in here. (Indicating) She hurt me twice as bad as I was hurt before I think. Then, after she wadded my head up and everything, they took me by the arm and led me over to the bed, and they told me to get in. I thought, "Well, gee whiz, if I lie down here, I'll never be able to get out of this bed. I'll bleed to death," because the blood was gushing, and when this man pulled my hands down, the blood gushed out all over and made me blinder than ever. I couldn't see anything. And then, after they guided me over to the bed, I

wouldn't get in, and, of course, they got kind of insistent, and—and—oh, then, I saw the white uniform of the nurse. I did not see her wrap my head up. I don't know who that was. She didn't get in front of me for me to see her. Then, the nurse came over to the bed over there beside me, and she said, "You better get in bed. You'll be all right." Well, I didn't want to get in bed, because this profuse bleeding was too much, and I could understand that I had better get standing up, or sitting up or something, because if I laid down, I would be really helpless. Then, she asked my name and telephone number—and she asked for my telephone number. I said, "My husband isn't home. He won't be home until 5:00 o'clock." So she went off to call him anyhow, and that took time, and all of the time I was leaning—Somebody else pushed a chair in back of me and leaned my head over on the bed. The bed was just all bloody. Again, I was losing blood all the time. The nurse came back again, and she said, "Nobody answers at that telephone." She said, "Do you have any other relatives?" Well, I had told her that nobody was there to answer the telephone. So she asked me for my brother-in-law's telephone number. That's the only other relative I have here. So she went over to call him, and that took another ten or fifteen minutes before she came back, and by that time, I was getting very sick to my stomach, about to pass out, and I thought, "Well, I just don't know what to do next," and all this time I kept screaming, "Why don't they get an ambulance?" . . . And this man that stood beside me, some fellow, all I could see—was his blue suit—I told him to press his arm real hard against the back of my neck to at least preserve a little of the blood that I had. So when the nurse came back, she said nobody answered at my brother-in-law's telephone number. "Who was my doctor? Who was my doctor?" And every time she came back, she says, "Well, you shut up. You keep quiet." She says, "You're making a disturbance," and all I did was ask for an ambulance. I wasn't giving her any kind of a bad time or disturbance or anything. If asking for an ambulance is bad, why then that was it. And then she said—I couldn't give her the name of a family doctor. Well, our family doctor had died about a year before that, and I couldn't think of any other doctor at the moment, and couldn't ask anybody. Well, I thought the doctors were so close around the corner that they might call somebody, and I didn't even know it was—Q. What did you mean by that? You say

doctors were so close around the corner. A. Well, they were at the Medical Building right around the corner. Q. You mean, the Medical-Dental Building? A. The Medical-Dental Building around the corner from the Frederick & Nelson; if they didn't have a doctor of their own, they could get just anybody in an emergency. Well, then, I was getting real sick to my stomach. I thought, "Well, I better get up into bed before I fall down and they wrestle with me and I really will bleed to death." I got up in bed, and I sat up high there so I could lean up against the back of the bed. I sat there while they were trying to get —I was hoping to get an ambulance sometime. Finally, the nurse, when I started to ask a little louder for the ambulance, she came in, and she says, "If you don't shut up," she says, "I'll call the police department, and they'll have to call an ambulance." Oh, I nearly fainted when they hadn't even called the ambulance yet, and all this time was going by, and I was bleeding, and then, finally, when I told her to go ahead and call anybody, call the police or anything at all, to get me out of there, and then I really did start to scream to get me out of there, and I think the whole store must have heard me, because I really did scream, and then when—about four minutes later, the ambulance came, and then they took me over to the King County Hospital. Whatever—whatever time it took there, I didn't mind, because they stopped the bleeding, and immediately after they took the bandage off, they looked at me, and they brought me— Q. Well now, may I interrupt? A. Yes. Q. Mrs. Johnson, before we get to the King County Hospital, you mentioned something about getting ill. What did—Was there any conversation with the nurse about that? A. Well, yes; yes. When— Just as the ambulance came in, I had to move to get up, and a bubble came up from my stomach finally, because that was the thing that was just about to make me pass out. So this bubble out of my stomach came up, like a bunch of vomit and stuff; it was just water, gobs, and the nurse jabbed a towel into my face, and she said, "Well, here she goes," and so that was it. And then I apologized to the nurse for screaming, because I had to have an ambulance.

Plaintiff was obviously in fear of losing her life and that fear was generated by her belief that the defendant's agents were depriving her of essential medical assistance. In support of that proposition was the testimony of Mrs.

Elsie Gibson, another shopper at the defendant's store, who happened upon the scene of the accident. She testified:

A. I could see that she had been seriously injured, and I was amazed at her presence of mind. There were several people around there, and she seemed to be the only one who had the situation under control to the extent that she was holding her hand to the side of her head and pleading with people to help her. She says, "I'll bleed to death. Will someone please help me stop this flow of blood?"

That the jury could, and no doubt did, believe that the plaintiff was in fear of losing her life finds support from the trial judge who said that plaintiff possessed such a state of mind. When the trial court denied plaintiffs' motion for reconsideration of its order of reduction in verdict, the learned judge said:

I am satisfied that Mrs. Johnson honestly believed that she was bleeding to death and that she might die and certainly it was a very disturbing 30 or 40 or 50 or 60 minutes for her before she reached the hospital.

The jury must have concluded that plaintiff's fear of bleeding to death was based upon a reasonable belief. The record indicates that Mrs. Johnson lost a substantial amount of blood before she arrived at the hospital. Even the defendant's witnesses admitted that she had bled "profusely". Dr. Hugh Toomey, who treated the plaintiff in the emergency room upon her belated arrival at the hospital, said:

She obviously needed surgical repair of her scalp wound which was assessed in more detail in the operating room later.

But in essence it extended from above the left eye, around over the ear on the right side to what we call the occipital area, to the post lateral aspect on the left, a little less far coming back on the left side, coming back again to above the ear; there were skin flaps raised so that the wound extended down onto the bony prominence of the eye on the left, and there was a fair amount of dissection or freeing of the scalp up off of the skull as a consequence of the wound. Q. She was almost scalped then? A. Yes. Q. Now, Doctor, was there any blood at

the time you saw her? A. Yes. Well, traditionally head wounds bleed quite ferociously, and that was the first question historically by the intern talking with the people who brought her in; there had been only a small amount of blood lost at the scene of the accident, and in the emergency room the wound was quite dry and not brisk. However, this was an underassessment of the situation. She subsequently in the operating room had a drop in blood pressure, and systemic changes, making it obvious that she had an apparent blood loss. She had a two-unit transfusion to improve that situation.

Concerning that second cause of action, the trial court instructed the jury as follows:

You are instructed that a store operating an escalator has a duty to a passenger injured on the escalator to provide care and attention that is reasonable in proportion to the circumstances of the particular situation, and if you find that defendant Marshall Field & Company, or its employees, failed to provide such care and attention to Mrs. Johnson, then, as to plaintiffs' second cause of action, you shall find defendant liable to plaintiffs for any damages, including pain and suffering, proximately caused by such lack of care and attention.

No exception was taken to that instruction. It thus became the law of the case and plaintiff's evidence well supported a verdict under it.

■■ Was the $20,000 verdict too large in amount? Certainly the subject matter of the damages, *i.e.*, plaintiff's fear of death because of the defendant's failure to provide her with necessary care and attention, is an element uncertain in character and not susceptible of being fixed with mathematical certainty. But that fact should not deprive the jury of its right to return a true verdict, nor should it give to the trial court the right to arbitrarily reduce the amount of the verdict to 12½ per cent of what the jury thought it should be. Courts must be extremely hesitant to interfere with the jury's verdict. *Ma v. Russell*, 71 Wn.2d 657, 430 P.2d 518 (1967).

Considering all the facts of the case, a verdict of $20,000 for the plaintiff was not unreasonable and the trial court

usurped the authority and responsibility of the jury when it reduced that verdict to $2,500. Justice Finley's statement in *Hogenson v. Service Armament Co.*, 77 Wn.2d 209, 218, 461 P.2d 311 (1969), is appropriate to the facts before us:

> We are convinced . . . that the amount here involved is not an unrealistic appraisal of the damages sustained. Since there was no significant evidence indicating that passion and prejudice played any part in the jury's determination, the test to be used is the conscience of the appellate court.

We are not shocked by the amount of the verdict—only by the fact that the trial court reduced the verdict.

To preserve the integrity of the fact-finding system in the jury trial, we reverse the trial court and reinstate the verdict of the jury. We remand the cause to the trial court for entry of judgment in accordance herewith.

HUNTER, C. J., FINLEY, ROSELLINI, HAMILTON, HALE, and STAFFORD, JJ., concur.

DONWORTH, J.† (dissenting)—I find myself unable to agree with the majority opinion and will briefly state my reasons for dissenting.

The record in this case reveals an unusual situation. In the amended complaint the plaintiffs alleged that the wife, while a customer in defendant's store in Seattle, was riding on an escalator and was injured through the defendant's negligence in that her scalp was nearly torn off by a descending step. The complaint also contained allegations to the effect that, after the escalator was stopped, Mrs. Johnson was not given proper care and attention by defendant's employees, although she was in fear of bleeding to death and was begging for help. The prayer of the complaint was for $60,000 general damages, and $1,500 special damages.

Several months prior to the trial, plaintiffs filed a notice of trial amendment (quoted in the majority opinion) which stated that the plaintiffs would insert in the complaint a

---

†Justice Donworth is serving as a justice pro tempore of the Supreme Court pursuant to Const. art. 4, § 2(a) (amendment 38).

separate paragraph, listing the further acts of negligence occurring *after* the escalator accident consisting of failure to give her reasonable and proper care as follows:

1. In failing to immediately call a Doctor, although literally dozens were available within a few hundred feet.

2. In failing to use proper care in giving first aid due to the wounds of plaintiff and exposing the plaintiff to untrained personnel who caused the plaintiff severe pain by jabbing her opened scalp and exposed skull.

3. In failing to immediately call an ambulance, after refusing to call a Doctor and in treating plaintiff discourteously and inhumanly thereby rendering her more nervous and making her hysterical, each of which acts of negligence contributed to the pain and agony of the plaintiff and to her disability, both temporary and permanent.

It is to be noted that no change was made in the prayer of the complaint and no segregation of the $60,000 amount originally prayed for, as between the two alleged causes of action, was requested.

At the trial, the court instructed the jury with respect to each cause of action, and in instruction No. 8 told the jury regarding this second cause of action:

You are instructed that a store operating an escalator has a duty to a passenger injured on the escalator to provide care and attention that is reasonable in proportion to the circumstances of the particular situation, and if you find that defendant Marshall Field & Company, or its employees, failed to provide such care and attention to Mrs. Johnson, then, as to plaintiffs' second cause of action, you shall find defendant liable to plaintiffs for any damages, including pain and suffering, proximately caused by such lack of care and attention.

No exception was taken by either party to this instruction.

The jury returned the following verdict:

We, the jury in the above-entitled cause, do find for the plaintiffs in the sum of $ *0* as to their first cause of action, and in the sum of $*20,000 as to their second cause of action.*

The trial court later stated in discussing plaintiffs' motion for reconsideration:

> When the verdict was announced I myself was greatly surprised about it. They returned zero on the first cause of action and then twenty thousand dollars on the second, and my immediate reaction was that they made a mistake, they had reversed two causes of action. And then I myself inquired of the jurors while still in the box, did you intend to deny recovery in reference to the accident and did you intend to award damages for the instance that took place during the hour following and they nodded in agreement, yes, that is what they had intended and that is what I think that you referred to.

Defendant moved for judgment n.o.v. or, in the alternative, for a new trial on eight of the nine grounds stated in CR 59.

This motion was twice argued. Originally, it was heard on May 26, 1967, and later, on motion for reconsideration on September 8, 1967. In each instance the trial court orally stated its reasons for its decision to grant a new trial on the second cause of action unless the plaintiffs within 10 days elected to accept a reduced award of $2,500.

On October 24, 1967, the trial court entered its order granting defendant a new trial unless the plaintiffs should consent to a reduction of the verdict from $20,000 to $2,500 within 10 days. Plaintiffs elected not to consent to the trial court's reduction of the verdict and appealed from its order conditionally granting a new trial as to the second cause of action. The notice of appeal was directed to the Supreme Court of the state of Washington, but the case was subsequently transferred to Division One of the Court of Appeals for hearing and decision.

The Court of Appeals affirmed the trial court's order and stated:

> Thus, while the trial judge erred in granting a new trial on the grounds of passion or prejudice, the order was correctly based on the failure of substantial justice. The order appealed from is affirmed.

*Johnson v. Marshall Field & Co.*, 1 Wn. App. 655, 463 P.2d 645 (1969).

The test to be applied is whether the amount of the verdict shocks the conscience of the appellate court. *See Hogenson v. Service Armament Co.,* 77 Wn.2d 209, 461 P.2d 311 (1969), and cases cited therein.

The trial court's reasons for conditionally granting a new trial were stated as follows:

> The amount of the award was such that the court was and is shocked by the amount. Such an amount cannot be justified. It is a gross miscarriage of justice. There was no testimony by any medical witness that the care and attention subsequent to the accident in any way contributed to the injuries or inhibited the plaintiff's recovery from those injuries. Three doctors were called and there was no testimony that the defendant's care and attention was improper. There was, further, no testimony that the defendant's care and attention, had it been improper, was a proximate cause of any additional injury or any aggravation of the existing injuries.
>
> The jury had already determined that the primary injury (the laceration of the head and assorted bruises) was not the fault of the defendant. The judgment on the plaintiff's first cause of action has been entered in favor of the defendant.

In my opinion, the trial court did not abuse its discretion in conditionally granting a new trial. The applicable decisions of this court are cited and discussed in the decision of the Court of Appeals.

It should be borne in mind that we cannot consider the adequacy or inadequacy of the jury's verdict on the first cause of action. However much we may sympathize with appellants because the wife was denied any recovery for the serious injuries she received in the original accident, that phase of the case cannot be considered at this stage of the proceedings.

I see no occasion to extensively discuss the matter of passion and prejudice as a separate ground for granting a new trial. While appellants assigned error to the order appealed from (granting a new trial) and the court erred in holding in its order that there was passion and prejudice, actually, the trial court's order was inconsistent in this

respect.[1] I agree with the majority that the trial court erred in granting a new trial on the ground of passion and prejudice. Nevertheless, I am firmly of the opinion that, for the reasons stated by the trial court (quoted above), the amount of the verdict is flagrantly outrageous and extravagant in the light of the evidence. Mrs. Johnson's treatment by respondent's employees, or their lack of proper care given her during the period of 45 minutes before they obtained the ambulance for her, could not, in view of her own testimony, have possibly resulted in $20,000 damages to her.

Therefore, I would hold that the verdict shocks the conscience of this court, and would affirm the trial court's order conditionally granting a new trial in this case.

Accordingly, I dissent from the majority's reversal of that order.

NEILL, J. (dissenting)—I dissent as I am in accord with the opinion of the Court of Appeals.

---

[1] See 1 Wn. App. 655 at 659-660.