[No. 50740-6.   En Banc.   May 23, 1985.]

DAVID A. BINGAMAN, *as Personal Representative, Petitioner, v.* GRAYS HARBOR COMMUNITY HOSPITAL, ET AL, *Respondents.*

*David Skellenger, Joan K. Elgee,* and *Riley, Skellenger, Ginsberg & Bender,* for petitioner.

*Lee, Smart, Cook, Martin & Patterson, P.S., Inc.,* by *Michael A. Patterson,* for respondent Grays Harbor Community Hospital.

*Billett, Comfort & Rosenow,* by *Allan R. Billett* and *Todd M. Worswick,* for respondent Nebel.

*Bryan G. Evanson* on behalf of Washington Association of Defense Counsel, amicus curiae for respondents.

ANDERSEN, J.—

### FACTS OF CASE

In this wrongful death and survival action based on allegations of medical malpractice, the jury returned a verdict in amount $1,002,089.03 against defendants Grays Harbor Community Hospital and Samuel F. Nebel, M.D. From a judgment entered on the verdict, these two defendants appealed to the Court of Appeals. That court affirmed, except as to the $412,000 portion of the judgment attributable to decedent's pain and suffering. As to this, the Court of Appeals reversed and remanded for a new trial limited to the issue of damages for pain and suffering unless the plaintiff would consent to a $206,000 reduction in damages. *Bingaman v. Grays Harbor Comm'ty Hosp.,* 37 Wn. App. 825, 685 P.2d 1090 (1984). Thus, the Court of Appeals ordered remittitur or a new trial, and as to that part of its

decision we granted discretionary review.

This case involves a wrongful death action brought by the surviving husband and two sons, and a survival action brought by the husband as personal representative of the estate of Deborah M. Bingaman, deceased. Mrs. Bingaman died at the age of 26, approximately 35 hours after giving birth to a baby at Grays Harbor Community Hospital. Dr. Nebel was Mrs. Bingaman's attending physician.

Deborah Bingaman was pronounced dead at midnight on October 26, 1978. Her death resulted from a condition known as eclampsia (toxemia of pregnancy). Prior to her admission to the hospital between 2 and 3 a.m. on October 25, she was preeclamptic in that she exhibited high blood pressure and other complaints. Her child was delivered at 8:30 a.m. of the same morning. The delivery was uneventful. Because of the defendants' failure to treat her condition, which is a well known one, it progressed to eclampsia evidenced by markedly increasing blood pressure and seizures. Eventually she developed disseminated intravascular coagulation, characterized by coagulation of the blood within the small peripheral blood vessels. Such coagulation, in turn, draws a large number of platelets out of a person's blood, and the resultant loss of ability to coagulate elsewhere leads to uncontrolled hemorrhaging throughout the person's body. The immediate cause of Mrs. Bingaman's death was breakdown of the blood vessels in her head causing bleeding into the brain.

The plaintiff introduced uncontradicted evidence of Mrs. Bingaman's physical agony and awareness of impending death throughout her ordeal. She first complained of headache in the mid–morning of October 25. Later that evening, she again complained of headache and also of backache, nausea and that she hurt "all over". Nurses observed her suffering. One nurse noted at 11 p.m. that she was in obvious distress and was banging on the side rails of her bed. She screamed and asked "Why don't you help me?" During this same approximate period, another nurse recalled that she was moaning and complaining of pain.

A patient in an adjoining bed heard her moaning and banging on the side rails. The patient testified that Mrs. Bingaman exclaimed: "I'm dying. I know I'm dying. Why can't they help me? What is the matter with me?" When the roommate offered to ring the bell, Mrs. Bingaman replied "No, it won't do any good. They won't give me anything. They can't help me."

During the early morning hours of October 26, Mrs. Bingaman suffered three separate grand mal seizures over a 3–hour period. Prior to the seizures, she was described as "very apprehensive". A catheterization after the second seizure revealed red blood cells in her urine, indicating a breakdown in the lining of either the bladder or kidney and hemorrhaging. Following each seizure, she regained consciousness and was alert. Between the last seizure at 4:25 a.m. and her eventual transfer to the University Hospital in Seattle late that afternoon, the record reflects that Mrs. Bingaman was in severe pain and aware of it. She was nauseated, complained of hurting, of severe headache and that she felt awful. The complaints of nausea, vomiting and severe headaches were evidence of cerebral edema. Her complaints of abdominal pain evidenced the onset of the liver problems which accompany severe eclampsia.

On the way to University Hospital, although sedated, she was restless, moaned and whined. A doctor who examined her upon arrival at that hospital found her to be bruised, swollen and oozing from intravenous puncture sites. Although in a stuporous condition, she was nonetheless responsive to pain and had to be restrained by her husband as medical personnel attempted to insert intravenous lines during the evening of October 26. Mrs. Bingaman was pronounced dead at midnight.

A single issue is before this court on discretionary review.

## Issue

Did the Court of Appeals err in reducing the damages by $206,000, that is by 50 percent of the sum awarded by the jury, for decedent's pain and suffering?

DECISION

CONCLUSION. We hold that the Court of Appeals erred by reducing the jury's damage award and reinstate the judgment entered by the trial court on the verdict.

█ The determination of the amount of damages, particularly in actions of this nature, is primarily and peculiarly within the province of the jury, under proper instructions, and the courts should be and are reluctant to interfere with the conclusion of a jury when fairly made.[1] If a jury's verdict is tainted by passion or prejudice, or is otherwise excessive, both the trial court and the appellate court have the power to reduce the award or order a new trial.[2] Because of the favored position of the trial court, it is accorded room for the exercise of its sound discretion in such situations.[3] The trial court sees and hears the witnesses, jurors, parties, counsel and bystanders; it can evaluate at first hand such things as candor, sincerity, demeanor, intelligence and any surrounding incidents.[4] The appellate court, on the other hand, is tied to the written record and partly for that reason rarely exercises this power.

An appellate court will not disturb an award of damages made by a jury unless it is outside the range of substantial evidence in the record, or shocks the conscience of the court, or appears to have been arrived at as the result of passion or prejudice.[5]

---

[1]*Baxter v. Greyhound Corp.*, 65 Wn.2d 421, 438, 397 P.2d 857 (1964).

[2]*Stanard v. Bolin*, 88 Wn.2d 614, 621, 565 P.2d 94 (1977); *Kramer v. Portland–Seattle Auto Freight, Inc.*, 43 Wn.2d 386, 395–96, 261 P.2d 692 (1953); *Steinman v. Seattle*, 16 Wn. App. 853, 855–57, 560 P.2d 357 (1977); *Freeman v. Intalco Aluminum Corp.*, 15 Wn. App. 677, 683–84, 552 P.2d 214 (1976). *See* RAP 12.2.

[3]*Olpinski v. Clement*, 73 Wn.2d 944, 950–51, 442 P.2d 260 (1968); *Baxter*, at 437–38.

[4]*Baxter*, at 437.

[5]*Rasor v. Retail Credit Co.*, 87 Wn.2d 516, 531, 554 P.2d 1041 (1976). *See Kramer*, at 394–96.

Following the verdict in this case, the two defendants, against whom the verdict for the plaintiff was returned, moved for judgment n.o.v. and/or for a new trial on the ground, among others, of damages so excessive as to unmistakably indicate that the verdict must have been the result of passion or prejudice.[6] The experienced trial judge who presided over the trial declined to reduce the damage award or to grant a new trial.

On appeal, the Court of Appeals also concluded that the jury's damage award was not outside the range of substantial evidence in the record[7] and that nothing so untoward occurred at the trial to arouse the passion and prejudice of the jury.[8] The Court of Appeals then went on to conclude: "that the damages awarded in this case for pain and suffering are an unrealistic, irrational appraisal of damages sustained. The jury must have taken out its wrath on defendants for causing, needlessly, the untimely death of a lovely young woman."[9]

Before passion or prejudice can justify reduction of a jury verdict, it must be of such manifest clarity as to make it unmistakable.[10] This is not a case wherein the judgment of the jury has been so distorted by passion generated at trial that the court has the duty to substitute reason for retribution. Other than the amount of the verdict, the record in this case discloses nothing to suggest that the jury was prejudiced against the defendants or that it was incited by passion to regard the defense case unfairly.

■■ The issue thus becomes whether the size of the award for pain and suffering in and of itself "shocks the

---

[6]CR 59(a)(5).

[7]*Bingaman v. Grays Harbor Comm'ty Hosp.,* 37 Wn. App. 825, 831, 685 P.2d 1090, *review granted,* 102 Wn.2d 1010 (1984).

[8]*Bingaman,* at 831–32.

[9]*Bingaman,* at 832.

[10]*James v. Robeck,* 79 Wn.2d 864, 870, 490 P.2d 878 (1971).

conscience of the court.".[11] Stated otherwise, were the damages flagrantly outrageous and extravagant?[12] The facts as they pertain to the decedent's pain and suffering in this case were sufficiently impressive that the jury's award of damages for the decedent's pain and suffering did not shock the conscience of the trial court, nor do they shock the conscience of this court.

Here the decedent's death was caused by the defendants' medical malpractice. Since the decedent left a surviving spouse and children, the personal representative suing under the tort survival statute, RCW 4.20.060, was entitled to recover damages for the decedent's pain and suffering caused by the malpractice.[13] The jury was thus correctly instructed that its verdict could properly include damages for pain and suffering, "both mental and physical" experienced until the time of her death.[14] The jury was also entitled to consider in that connection the decedent's fear that she was dying,[15] and in view of the graphic and uncontested evidence presented in that regard, doubtless did consider it.

Although the decedent was unconscious during some part of her last 35 hours of life, due to her condition or sedation or both, substantial evidence was presented from which the jury could find that during much of that period of time she not only suffered extreme conscious pain, fear and despair at not being helped, but also had the conscious realization her life and everything fine that it encompassed was pre-

---

[11]*Hogenson v. Service Armament Co.*, 77 Wn.2d 209, 218, 461 P.2d 311 (1969); *Johnson v. Marshall Field & Co.*, 78 Wn.2d 609, 617–18, 478 P.2d 735 (1970).

[12]*Kramer*, at 395.

[13]*Walton v. Absher Constr. Co.*, 101 Wn.2d 238, 676 P.2d 1002 (1984).

[14]*See Lofgren v. Western Wash. Corp. of Seventh Day Adventists*, 65 Wn.2d 144, 151, 396 P.2d 139 (1964).

[15]*Johnson v. Marshall Field & Co., supra.*

maturely ending. The verdict of a jury does not carry its own death warrant solely by reason of its size.[16] It is admittedly difficult to assess in monetary terms the damages for such pain and suffering, but although the damages for the decedent's pain and suffering awarded by the jury were very substantial, that award does not under the facts and circumstances established by the evidence shock our sense of justice and sound judgment.[17]

The Court of Appeals is reversed insofar as it reduced the damages awarded the plaintiff and the judgment of the trial court is reinstated.

DOLLIVER, C.J., and UTTER, BRACHTENBACH, DORE, PEARSON, CALLOW, GOODLOE, and DURHAM, JJ., concur.

---

[16]*See Kramer,* at 394.

[17]*See Hogenson,* at 218. *See also Johnson,* at 617–18.