851 F.Supp. 1481 (1994)
Michael J. CHAPPLE, as Personal Representative of the Estate of Peggy Chapple, and as father of Christopher Chapple, a person under the age of 18, as in his own right; Russell Chapple, Greg Chapple and April Chapple, Plaintiffs,
v.
Jorawar Singh GANGER, and Baljit Singh Gill, Defendants.
No. CS-93-107-CI.
United States District Court, E.D. Washington.
May 12, 1994.
*1482 *1483 *1484 Robert L. Parlette and Malcolm C. McLellan, Davis, Arneil, Dorsey, Kight & Parlette, *1485 Donald C. Bell (Guardian Ad Litem), Wenatchee, WA, for plaintiffs.
Gregory J. Arpin and Michael B. Love, Chase, Hayes & Kalamon, Spokane, WA, for defendants.
OPINION, INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW, FOLLOWING SUMMARY BENCH TRIAL, AND DIRECTING ENTRY OF JUDGMENT FOR PLAINTIFFS
IMBROGNO, United States Magistrate Judge.
On June 7, 1992, due to the negligence of Defendants, Peggy A. Chapple died in a motor vehicle accident in Okanogan County, Washington. Additionally, Ms. Chapple's ten year-old son, Christopher, the only passenger in the car driven by his mother, was injured severely. A wrongful death and survival action ensued in Okanogan County Superior Court, and was removed to federal court under diversity of citizenship jurisdiction, 28 U.S.C. § 1332. Plaintiffs, represented by attorneys Robert L. Parlette and Malcolm McLellan and Guardian ad Litem Donald C. Bell, are domiciliaries of the State of Washington. Attorneys Gregory Arpin and Michael Love represent Defendants, residents of British Columbia, Canada.
On July 29, 1993, pursuant to 28 U.S.C. § 636(c), the parties consented to proceed before the undersigned United States magistrate judge. (Ct.Rec. 14.) More recently, the parties stipulated to an abbreviated bench trial. Specifically, Defendants conceded liability and the parties waived their right to trial by jury. It was agreed the undersigned would determine damages based upon a review of deposition testimony submitted by the parties, their experts and witnesses, as well as expert reports, briefing, and argument of counsel. The parties presented the evidence to the court during two days of formal proceedings.
The parties further agreed the undersigned would enter a final, non-appealable judgment for an amount of damages. The judgment is to be satisfied upon payment by Defendants of an agreed sum of money, a sum which has not been revealed to the undersigned. (Ct.Rec. 109, Stipulation for Abbreviated Trial Procedure.) These stipulations were reached after notice to and without opposition from, the court-appointed guardian ad litem.
The court is satisfied the procedure is consistent with the undersigned's constitutional and statutory authority and is consistent with a magistrate judge's judicial capacity, as analyzed in DDI Seamless Cylinder Int'l., Inc. v. General Fire Extinguisher Corp., 14 F.3d 1163, 1166 (7th Cir.1994). As a result, the anticipated two weeks of trial distilled to two days.[1]

APPLICABLE LAW
Three legal claims are before the court: (1) A claim for damages by the estate of Peggy Chapple under the survival statutes of the State of Washington; (2) wrongful death claims under the applicable state law by Ms. Chapple's statutory beneficiaries: spouse Michael Chapple; her minor son, Christopher Chapple, as well as adult children Russell Chapple, Greg Chapple, and April Chapple; and (3) a personal injury claim for damages in tort by Christopher Chapple.

SURVIVAL CLAIM
The parties agree that under Washington law, the special survival statute allows the personal representative of a deceased person's estate to recover damages for the estate, if the injury resulted in death. RCW 4.20.060;[2]Benoy v. Simons, 66 Wash.App. 56, 61, 831 P.2d 167, rev. denied, 120 Wash.2d 1014, 844 P.2d 435 (1992). The purpose of damages under the survival statute is to *1486 reimburse the decedent's estate for the monetary losses it sustained as a result of the untimely death. Wooldridge v. Woolett, 28 Wash.App. 869, 871, 626 P.2d 1007, affirmed, 96 Wash.2d 659, 638 P.2d 566 (1981).
The first type of damage is the loss of net earnings that would have been accumulated by the estate. This amount is calculated by establishing the deceased's future net earnings, less all probable deductions for personal and family expenses and any other adjustments required, and reducing that figure to its present value. Wagner v. Flightcraft, Inc., 31 Wash.App. 558, 568, 643 P.2d 906, rev. denied, 97 Wash.2d 1037 (1982).
Here, the evidence discloses Ms. Chapple had worked in restaurants as a food server for most of her adult life. At times, she was the sole support of her family. On the date of her death, she was employed as a food server at the Edelweiss Restaurant in Oroville, Washington. She was earning $4.90 an hour, averaging 38 to 40 hours per week as a permanent employee. Plaintiffs contend Ms. Chapple's hourly wage should be increased to reflect alleged tips of approximately $200 per week and the promise of a promotion to assistant manager at a salary of $1,500 per month. Thus, Plaintiffs calculate the estate's loss of economic benefits as $227,200.
Defendants contend the amount of tips was not reflected in Ms. Chapple's income tax return and, therefore, is speculative. They further argue the position of assistant manager never became a reality. Historically, Ms. Chapple's annual income averaged near $10,000. (Donald A. Reddington, CPA, Dep. at 38.) Furthermore, Defendants note the Edelweiss Restaurant has closed since the accident.
The court concludes the estate's loss of economic benefits should be based on Ms. Chapple's proposed salary of $1,500 per month. Because of the management responsibilities and the lack of evidence that tip income would be available in that position, the court does not include an amount for tips. Accordingly, the assumptions made by Plaintiff's economic expert are modified to reflect an annual income of $18,000, rather than $18,400. The court also is convinced, based on the evidence of Ms. Chapple's personal traits and work habits, that she would have remained employed to the age of 65, rather than choosing to retire at 62. Also accepted is the assumption that despite the closure of the Edelweiss Restaurant, given Ms. Chapple's capabilities and work history, she would have been able to secure a new position with comparable earnings and no significant time loss. Therefore, the total loss of earnings sustained is $291,600.
Having determined that amount, the court must deduct the personal and family expenses that would have been paid by Ms. Chapple from her estate. Relying on the testimony of Defendants' economist, the court finds 32% of Ms. Chapple's income would have been expended and, therefore, should be deducted from the gross earnings. Finally, the court is required to reduce the remainder to its present value; however, based again on the Plaintiff's expert, the total offset method will be used. Having made the necessary calculations, the award for loss of net earnings to the estate is $198,288.[3]
In addition to loss of net earnings, a survival action also authorizes an award to the estate for those damages recoverable in a garden variety tort action:
(1) Medical and hospital expenses. See Orcutt v. Spokane County, 58 Wash.2d 846, 857-58, 364 P.2d 1002 (1961). None have been claimed on behalf of the estate.
(2) Funeral expenses. See Warner v. McCaughan, 77 Wn.2d 178, 184, 460 P.2d 272 (1969). There is no dispute the funeral and related travel expenses total $6,000.
(3) Property damage. See Covey v. Western Tank Lines, 36 Wn.2d 381, 218 P.2d 322 (1950). There is no dispute the property damage consists of the total destruction of the Chapple vehicle, valued at $3,880.
(4) Pain and suffering. If any measurable time ensued between the injury and death, damages for pain and suffering may be awarded. Bingaman v. Grays Harbor Community Hospital, 103 Wash.2d 831, 837, 699 P.2d 1230 (1985); see also Walton v. *1487 Absher Construction, 101 Wash.2d 238, 243, 676 P.2d 1002 (1984). Here, the coroner testified unconsciousness was "instantaneous" and death was "almost instantaneous." (Pl.Ex. 5.) The coroner further noted the "injuries indicate a massive force from the front and left struck the skull, face and upper torso with hyperflection of the thorasic cavity causing all of the rib fractures and disarticulations, as well as the complete traumatic rupture of the aorta." Because loss of consciousness was instantaneous, the court concludes there is no basis on which to award damages for pain and suffering.
(5) Fear. Plaintiffs contend they are entitled to damages for any fear experienced by Ms. Chapple prior to her death. RCW 4.20.060; see also Bingaman, 103 Wash.2d at 837, 699 P.2d 1230, citing Johnson v. Marshall Field & Co., 78 Wash.2d 609, 617-18, 478 P.2d 735 (1970). Defendants respond that any evidence of such fear would be based upon conjecture and speculation since Ms. Chapple's death was almost instantaneous and Christopher Chapple has no memory of the accident, citing Olympia Oyster Co. v. Rayonier, Inc., 229 F.Supp. 855, 861 (W.D.Wash.1964). However, the court is mindful that during his hospital stay, Christopher Chapple, on one occasion when he was not fully cognizant, screamed "Watch out, Mom! Watch out, Mom!" Thus, there is credible evidence that both mother and son were aware of and did appreciate the impending impact at least several seconds before it happened, even though there is no evidence Ms. Chapple had sufficient time to physically react with the vehicle. The court concludes sufficient evidence of fear has been submitted and damages of $25,000 are appropriate.

WRONGFUL DEATH CLAIMS
Michael Chapple, Rusty Chapple, Greg Chapple, April Chapple and Christopher Chapple seek damages under the state wrongful death statute. Under RCW 4.20.010,[4] the personal representative of the decedent's estate may maintain an action for damages against the tortfeasors to recover the value of the pecuniary interest lost as a result of the wrongful death. Under RCW 4.20.020, the surviving spouse and children are the beneficiaries of the wrongful death action. Pecuniary loss includes not only the monetary contributions the decedent would have made to the beneficiaries, but also intangible losses. Bowers v. Fibreboard Corp., 66 Wash.App. 454, 460, 832 P.2d 523, rev. denied, 120 Wash.2d 1017, 844 P.2d 436 (1992). No damages may be awarded for grief or bereavement, but an award is authorized for the loss of love, affection, care, service, companionship, society, training, and consortium the decedent would have provided to the beneficiaries. Id.

1. Damages Proved By Adult Children.

A. Russell Chapple. Ms. Chapple's adult son by a previous marriage, Russell (Rusty) Chapple, is married, the father of two minor children, and an employee of Shopko, Inc. in Lewiston, Idaho. He spent his childhood at the home of Peggy and Michael Chapple and has only a distant relationship with his natural father. Even as an adult, he maintained a very close relationship with his mother, seeing her one to three times per month, on holidays and talking by telephone on a weekly basis. His mother was close to her grandchildren. Ms. Chapple assisted financially during the early years of Rusty's marriage and continued to provide gifts to the family. Rusty Chapple stated his mother was more directly involved in his parenting than Michael Chapple. His relationship with his stepfather has been fragmented further by Michael Chapple's remarriage.
B. Greg Chapple. Greg Chapple currently resides in Lewiston, Idaho. He is single and has no children. He also was an average student, active in athletics and has a work history in retail sales. While attending Western Business College, he became involved in a drug distribution network. He pled guilty in federal court to possession of cocaine; he was sentenced to 45 days in jail, three years probation and $2,500 in fines. His mother did not know of the charge prior to her death. Greg Chapple remained in contact with his parents after moving from the family home. He returned home approximately twice a year to visit his family. After the accident, Greg Chapple stayed in Spokane while his younger brother was in *1488 the hospital and returned to Oroville with him until the arrest and sentencing.
C. April Chapple. April Chapple is currently a resident of New York City. She is completing a two-year college program and hopes to obtain a four-year degree in fine arts and forensic photography. She maintains a cumulative GPA of 3.62 and is in honors classes. She also works for an architectural firm and makes approximately $1,700 per month. After she moved to New York, April continued to talk with her mother by phone once or twice a week. Prior to 1991, she also visited the family home once or twice a year for two to three weeks. After the accident, April returned to Oroville and became the primary caretaker of Christopher for three months after his accident. Christopher also has made two visits to her home in New York since his recuperation. April and Christopher have maintained a very close relationship since the death of their mother.
D. Award. The court is impressed with the devotion Peggy Chapple exhibited towards her family in providing the love, care, protection, guidance and moral training for each of these children. She actively was involved in their school work and athletic activities. That devotion further is evidenced by the closeness of the relationship between mother and child after each child reached the age of majority and left the family home. Although it is difficult to measure such devotion in terms of dollars, the court concludes that the pecuniary loss suffered by these children is $60,000 each.

2. Damages Proved By Minor Child.

At the time of his mother's death, Christopher Chapple was ten years old and had completed the fourth grade at the Oroville elementary school. His report card reflects he was an average and outgoing student, receiving a grade average of C+ or B- (2.58 on a scale of 4.0) for the year. No significant behavioral problems were noted, although his social and personal habits were graded at average or average-low. (Pl.Ex. 23.) His parents, especially his mother, were hopeful that Christopher would attend and complete a four-year college program. That opinion was shared by his fourth grade teacher, who viewed herself as a strict grader and stern disciplinarian.
It is undisputed Christopher and his mother shared an extremely close relationship. Her death was devastating to him to the extent he is unable to express his feelings about his loss. It is evident Peggy Chapple was the more active parent, taking an interest in every aspect of her youngest son's life. They spent most evenings together, doing school work, attending athletic events, taking short drives or collecting baseball cards. Although Christopher has adjusted to his father's remarriage, the adjustment period has been stressful, especially learning to live with an older stepbrother. Based on the close relationship between mother and son, and given the fact of his minority, the court concludes the sum of $160,000 is reasonable to compensate Christopher for the loss of his mother.[5]

3. Damages Proved By Spouse.

At the time of his wife's death, Mike Chapple was 49 years old and a high-school graduate. He had been married for 24 years and was the father of Greg, April, and Christopher Chapple and stepfather to Rusty. He was a part-time musician and part-time presize lead worker at the Gold Digger Apple packing plant, earning $10.40 an hour.
In 1979, the couple separated for a few months because of disagreements about raising the children and Mr. Chapple's feeling of being "left out" of the family. After receiving marriage counseling through their church, they reunited. Shortly thereafter, Christopher was born. At the time of Peggy Chapple's death, the marriage was strong.
Mike Chapple testified that on the evening before the accident, he had been camping with Christopher and a buddy, returning the day of the accident. After dinner, he stayed home in his pajamas while Peggy and Christopher went for a drive, as was their nightly custom. When he heard the sirens of the emergency vehicles, he drove to the scene but was unable to see anything because of traffic. He went home to wait for Peggy and *1489 Christopher, then received a phone call that his wife had been killed and his son injured. He went immediately to Spokane with a friend to be with Christopher at the hospital. He returned to Oroville for Ms. Chapple's funeral and then returned to the hospital.
Mike Chapple has noticed significant changes in Christopher's behavior and his academic progress since the accident. The evidence indicates his parenting skills were inadequate to meet Christopher's needs. Christopher was dependent upon April during the first months after the accident for the necessary nursing care. The loss of Peggy Chapple's support and services has been a source of frustration to the entire family; Mike Chapple feels the family was destroyed by the accident. The court concludes Mike Chapple should be awarded $75,000 for the loss of consortium, support and services of Peggy Chapple.

TORT CLAIM
Christopher Chapple, through his guardian Michael Chapple, has sued Defendants in tort, seeking both economic and noneconomic damages for the losses he suffered as a result of the injuries sustained in the accident. To recover damages, a plaintiff must present sufficient evidence regarding the nature and amount of the damage. Recovery for future medical expenses may be awarded if those expenses are reasonably certain to be incurred and necessitated by the injuries. Erdman v. B.P.O.E., 41 Wash. App. 197, 208, 704 P.2d 150, rev. denied, 104 Wash.2d 1030 (1985). These expenses need not be proven to a mathematic certainty. Id.
A parent may maintain an action as plaintiff for the injury of a minor child. RCW 4.24.010. In such an action, a parent may recover for the medical, hospital, and medication expenses incurred, as well as the loss of services and support, love and companionship of the child and the injury to or destruction of the parent-child relationship. Id.

1. Past Medical Expenses.

Christopher was found unconscious and wedged under the dashboard of the car. The investigating officers concluded he had been wearing a seat belt at the time of the accident. The fire department immobilized his spine and took Christopher by ambulance to North Valley Hospital in Tonasket, Washington. James M. Helleson, M.D., treated Christopher in the emergency room and, following x-rays of his spine and chest, diagnosed a possible brain injury. Christopher was flown to Deaconess Medical Center in Spokane for treatment, where he remained hospitalized from June 7 to June 19, 1992.
At the time of his arrival, Christopher had an ecchymosis[6] of the left eye, and multiple abrasions and contusions on his lower legs and across his chest. He was responsive only to painful stimuli. Once stabilized, Christopher was admitted into Deaconess Pediatrics Intensive Care Unit, where he was unconscious for nearly 24 hours.
Neurosurgeon John J. Demakas, M.D., the primary treating physician, diagnosed "moderate" to "severe" head injury, with bifrontal contusions, characterized as a "permanent impairment" in a report to the Department of Labor and Industries crime victims compensation program. (Demakas Dep. at 10, 23.) Dr. Demakas opined, on a more probable than not basis, Christopher would have some degree of permanent cognitive deficits, memory problems, problems with eye-hand coordination and thinking clearly.
Dr. Demakas referred Christopher to Vivian Moise, M.D., for further evaluation. Dr. Moise, who treated Christopher while he was hospitalized, reported he had a conjugate[7] gaze, slurred speech, short attention following a few short commands, and limited response to motor commands. He did not open his mouth and was restless and agitated. (Moise Dep. at 32 and Ex. 3.) She opined Christopher had a "moderate" closed head injury with bifrontal hemorrhagic contusions, with primary deficits appearing in the area of attention with significant impulsivity. She further noted his condition was improving rapidly. On Dr. Moise's recommendation, Christopher was not allowed to attend his mother's funeral. (Moise Dep. at 41.) His hospitalization continued because of lack of treatment facilities at his home. (Moise Dep. at 14.)
Following discharge, Dr. Moise recommended that Christopher be supervised 24 *1490 hours a day; have minimal external environmental stimuli; not ride a bike for a month, and when he did ride, to wear a helmet; not compete in sports until the fall; not use power equipment; and perform only light chores. Dr. Moise ordered outpatient speech and occupational therapy two to three times per week. He was not scheduled to see Dr. Moise again except on an "as needed" basis if rehabilitation questions should arise. His recuperation would be followed by his local family physician, Dr. Lyle Cowan of Omak.
Dr. Demakas examined Christopher one month after his discharge. He was doing well, having some slight headaches and some problems with balance. Dr. Demakas did not test him for cognitive or emotional deficits, only his physical well-being. (Demakas Dep. at 14.) However, at his deposition, Dr. Demakas stated he would defer to the interpretation of neuropsychological tests that Christopher did not have cognitive deficits. (Demakas Dep. at 26.)
Dr. Moise referred Christopher to psychologist Paul J. Domitor, Ph.D., for the purpose of making recommendations as to school adaptation. Dr. Domitor first saw Christopher, accompanied by his father, on August 3, 1992. He spent an hour conversing about child care issues. Dr. Domitor noted Christopher was "kind of sad." When discussing his mother, his affect was flat. Testing was postponed because no changes in Christopher's level of functioning were noticed. (Domitor Dep. at 32.) Tests were administered in May and June 1993.
On September 9, Dr. Demakas again examined Christopher. No behavioral problems were apparent at that point; Dr. Domitor had released him from further psychological follow-up. Dr. Demakas informed Christopher to take it easy playing sports and to wear his bicycle helmet. Christopher did not need to return on a regular basis. Dr. Demakas opined Christopher was doing very well. (Demakas Dep. at 15.) Dr. Demakas did not feel that further radiological tests were necessary. (Demakas Dep. at 16.) When questioned whether the appearance of behavioral problems during the second school year following the accident could be attributed to the head injury, Dr. Demakas opined it would be based not only on the physical injury but also the psychology of the injury and the loss of his mother. (Demakas Dep. at 19.)
Dr. Domitor stated his preference is to use the Halstead-Reitan battery of tests[8] in discriminating between normal and brain injured children. (Domitor Dep. at 50.) After testing, Dr. Domitor was concerned about Christopher's freedom from distractibility, low processing speed, low Mazes score, mental arithmetic coding and digit span scores, and picture arrangement. (Domitor Dep. at 69-70.) Dr. Domitor especially was concerned about the results on the Mazes test which measures the child's ability to plan and organize, a function of the frontal lobe. In contrast, on tests known to be resistant to brain injury, Christopher scored approximately one standard deviation above the mean in terms of intellectual function. (Domitor Dep. at 74, 96.) On the Wide Range Achievement TestRevised (WRAT), Christopher scored at his appropriate grade level. (Domitor Dep. at 84.) Christopher scored at the kindergarten level in a memory test of names, yet scored at the eighth grade level in a memory test involving context. (Domitor Dep. at 131.) Dr. Domitor opined the difference in scores (disassociation) would be indicative of frontal lobe injury because of the function of sequencing information. Additionally, some answers were repetitively socially inappropriate, an indication Christopher has trouble monitoring his behavior, also a function of the frontal lobe. (Domitor Dep. at 138.) Dr. Domitor noted Christopher worked diligently on all the tests. (Domitor Dep. at 119.)
In summary, Dr. Domitor made the following findings: (1) Christopher sustained a traumatic brain injury in June 1992; he now has mild cognitive problems; he has moderate behavioral problems involving social appropriateness and the ability to inhibit emotions; he has trouble controlling his behavior and understanding social demands; and he is *1491 experiencing some depression from the loss of his mother. Dr. Domitor opined these problems would increase as Christopher grew older (Domitor Dep. at 141, 144), based on scientific literature that suggests if a child's brain is injured before full development of the functions performed by that portion of the brain, further neuropsychological development may be compromised. An area particularly sensitive is frontal lobe injury. (Domitor Dep. at 151.)
Dr. Domitor recommended continued psychological help, including contacts with the school counselor and mental health worker. Additionally, he suggested an individual education plan should be developed for Christopher by the school district and additional training considered, including perhaps residential training for adolescents with brain injuries.[9] (Domitor Dep. at 158.) The extra training should continue at least through high school, depending on Christopher's academic success. Finally, Dr. Domitor stated he would not make a prognosis as to Christopher's future as it would depend on developments over the next four to five years. (Domitor Dep. at 161.) Dr. Domitor had no further plans to treat or test Christopher.
Todd J. Mayther, counselor for the Oroville School District, grades kindergarten through seven, first knew Christopher during the fourth grade when he taught refusal skills. (Mayther Dep. at 14.) He first met Mike Chapple during the fall of 1992 when the school had some concerns about Christopher's progress in the fifth grade. Those problems encompassed inappropriate behavior stemming from what Mr. Mayther described as an inability to relate cause and effect. (Mayther Dep. at 16.) Additionally, Christopher was having unusual problems with math. Mr. Mayther met with Christopher in counseling sessions on a weekly basis. At first, Christopher was dealing with grief issues, anger and depression about death. He noted he had spent over 100 hours with Christopher during the fifth and sixth grades, 1992 through 1993. (Mayther Dep. at 21.)
Mr. Mayther noted Christopher does not seem to have close friends due in large part to his behavior. Mr. Mayther has had good cooperation from Mike Chapple. Characterizing Christopher as a hard-working student and not a "quitter" (Mayther Dep. at 28), Mr. Mayther opined the cause of Christopher's problems was more than simple depression. (Mayther Dep. at 29.) The counsellor also noted Christopher's fourth grade tests would indicate he was college material. (Mayther Dep. at 53.) In comparison, his test scores in sixth grade were in the fourth percentile, similar to children who are mildly mentally retarded. (Mayther Dep. at 54.) Mr. Mayther concluded the problems would get worse as Christopher's responsibilities became more stressful. (Mayther Dep. at 63.)
Robert F. Nevins of Omak, Washington, a county mental health professional and children's specialist, treated Christopher through the Friendship Program, a joint venture between the school district and the mental health clinic. Additionally, Jenne Williams, a mental health technician, provided case management services involving Christopher. He was referred to the program on October 21, 1993, after some inappropriate behavior observed by the school. (Nevins Dep. at 14, 23.) The behavior included ingesting five aspirin, as well as attempting to put a piece of foil in an electrical socket.
The goals set for Christopher included dealing with grief issues, inappropriate behavior, personal safety including suicidal gestures, and parent/child relationship. (Nevins Dep. at 29.) In February 1994, Christopher was doing reasonably well meeting his goals. Mr. Nevins concluded the aspirin incident was merely an attempt to impress a girl, rather than a serious suicide attempt. (Nevins Dep. at 30.) Mr. Nevins opined some of the behavior problems could be a result of his father's remarriage. (Nevins Dep. at 36.)
The expenses associated with Christopher's care during the months following the accident and prior to this hearing are, for the most part, undisputed by Defendants. Thus, Plaintiff shall be awarded the sum of $29,013 for past medical expenses incurred.[10]
*1492 Plaintiff also seeks reimbursement for charges made by Dr. Catherine Mateer who, at the request of counsel, performed certain tests to determine if Christopher has a permanent cognitive deficit. Defendants object to the inclusion of this item as a past medical expense because Dr. Mateer was not a treating physician, but was hired at the request of Plaintiff's counsel to render an expert opinion for litigation purposes. The court agrees; Plaintiff may not be awarded the expenses incurred as a result of Dr. Mateer's testing, as a past medical expense.

2. Future Medical Expenses.

Under Washington law, one may recover for future medical expenses reasonably certain to be incurred. Prior to an allowance for the cost of future medical care, evidence must indicate the care will be necessitated by the plaintiff's injury. Erdman, 41 Wash.App. at 197, 704 P.2d 150.
Based on Dr. Domitor's assessment, Christopher is experiencing the behavior and cognitive problems associated with frontal lobe injury in children. He has displayed socially inappropriate behavior at school and an inability to control his impulses. The court concludes Plaintiff sufficiently has established that additional training, including residential treatment, is warranted as a necessary future medical expense. Plaintiff seeks $50,000 for remediation services at Mountlake Terrace, an additional $14,000 for counseling services by Mr. Nevins, and costs associated with rehabilitation of organizational skills of $60,000. In a letter addressed to defense counsel, Dr. Joseph Moisan, a vocational rehabilitation expert, recommended the Brown Schools in Texas for residential head injury treatment. The cost associated with a residential program would range from $100,000 to $160,000, depending on the length of treatment. The evidence supports an award of $124,000[11] as reasonably necessary for future medical expenses, whether those services be provided locally or in Texas.

3. Loss of Parent-Child Consortium.

RCW 4.24.010 authorizes an award of damages for the loss of parent-child consortium resulting from the injury or death of a minor child. To maintain such an action, there must be evidence of an injury to the child with resulting damages. Benoy, 66 Wash.App. at 64, 831 P.2d 167. In such an action, damages may be recovered for the loss of two types of non-pecuniary injury: (1) love and companionship of the child and (2) for injury to or destruction of the parent-child relationship. These items of damage are separate and distinct; recovery may be had for each. Colleen v. United States, 843 F.2d 329 (9th Cir.1987); Hinzman v. Palmanteer, 81 Wash.2d 327, 501 P.2d 1228 (1972). In Colleen, the court awarded parents $300,000 in nonpecuniary damages for the injury to their daughter who was brain damaged at birth. In Shaw v. United States, 741 F.2d 1202, 1210 (9th Cir.1984), the court reduced from $2,000,000 to $50,000 an award made to parents of a severely handicapped child.
Here, the evidence is that Christopher suffered a moderate brain injury that has affected, temporarily, his executive function.[12] Although there is evidence he may require special education during his minority to enable him to compensate for these impairments, there is insufficient evidence he will be totally or permanently disabled and unable to live independently and successfully *1493 support himself after reaching the age of majority. See also discussion, infra, at 25, et seq. Based on this evidence, the court awards Michael Chapple $15,000 for each item, a total of $30,000.

4. Lost Earning Capacity and Employment Opportunities.

Recovery for lost wages or earning capacity compensates an injured party for loss of economic value associated with one's vocation; recovery for disability compensates for the inability to lead a normal life; and recovery for loss of enjoyment of life compensates for the loss of a specific, unusual activity outside of one's vocation, such as athletics or artistic pursuits. Kirk v. Washington State University, 109 Wash.2d 448, 461, 746 P.2d 285 (1987).
Plaintiff argues Christopher should be awarded in excess of $2,000,000 for his lost earning capacity and employment opportunities. He contends that prior to the accident, Christopher was a reasonable candidate to obtain a four-year college degree. As a result of the accident, Plaintiff argues Christopher will, more probably than not, be limited to entry level positions at a minimum wage. The court notes the extent of this loss depends upon the extent of permanent disability suffered by Christopher. Not surprisingly, the experts disagree.
Dr. Domitor opines that frontal lobe injury may result in significant impairment of certain cognitive functions and behavior. He notes these conditions are not always immediately apparent but may become more symptomatic as the child's environment becomes more demanding and stressful. Thus, he was not surprised by the development of problems, both academic and behavioral, observed by school officials in the second year following Christopher's accident. He was unwilling to make a prognosis as to Christopher's future.
At the request of Plaintiff's counsel, Christopher was examined and tested by Dr. Catherine Mateer, neuropsychologist, Director of Neuropsychology Services at the Good Samaritan Hospital, and research associate professor at the University of Washington. Dr. Mateer's conclusions are summarized in her report at 9 and 10:
Christopher is an 11 year-old male who suffered a moderate to severe traumatic brain injury secondary to a motor vehicle accident on June 7, 1992. Secondary to his injury changes have been noted in Christopher's physical, cognitive and emotional functioning. Christopher now frequently suffers from headaches and has difficulty attending and concentrating. He is also noted to be more easily frustrated and has suffered a decline in grades since the accident.
Neuropsychological evaluation revealed a youngster with average range intellectual skills and solid abilities in the areas of language and visuospatial functioning. Areas of weakness or cognitive deficit were seen on measures assessing attention and concentration, and measures of new learning and memory. Though Christopher did score within the normal range on some of these tasks, he appears to have more difficulty with tasks requiring vigilance or a higher level of mental control. Additionally, there is considerable variability within his new learning and his ability to retain information over time.
Deficits in attention/concentration and new learning/memory abilities are common sequelae secondary to traumatic brain injury. Such deficits are particularly troublesome for children within an academic setting. In addition to the injury suffered, Christopher also suffered the loss of his mother, and what was described as a close relationship between he [sic] and his mother. The impact of this loss on Christopher's overall well being may be in part responsible for changes in his attitude and mood. Though Christopher did exhibit some symptoms of depression, several measures of cognitive function which would be sensitive to the effects of depression were within the normal range. As such, deficits noted are felt to be directly related to the head injury he sustained in the motor vehicle accident.
Dr. Mateer testified that no single test "confirms or disconfirms brain impairment." Basically, a professional must look at the "patterns and profiles and compare them to pre-injury levels of functioning." (Mateer Dep. at 11.) Dr. Mateer testified that clear functional impairments cannot be demonstrated with all brain injuries. She noted there have been cases when brain injured persons, including persons with "penetrating brain injuries," *1494 have recovered and led normal productive lives. (Mateer Dep. at 12.)
Dr. Mateer noted that in taking a history from Christopher's father regarding Christopher's behavior prior to the accident, Mr. Chapple related that Christopher had "a few behavior problems before" (throwing spitballs and talking in class), but that he had not required detention. Dr. Mateer also related that Mr. Chapple did not indicate Christopher had been graded below average with respect to behavior and deportment, was seen as spoiled and demanding, and somewhat hyperactive, and had she known of such factors,[13] their significance would have "depend[ed]" on "what was being observed and whether or not it wasif there was difference in behavior before and after." (Mateer Dep. at 34.) Given Christopher's age, gender and his placement in the family as the youngest child, it was not surprising to her that these characteristics were noted and she did not consider them to be outside the realm of normal. (Mateer Dep. at 37.) Dr. Mateer considered Christopher's injury to be in the moderate to severe range, loss of consciousness up to or exceeding 24 hours. (Mateer Dep. at 42.)
Dr. Mateer observed that on Christopher's school MAT tests, the second grade total composite battery was approximately within the 71st percentile, and in the third grade, the 76th percentile. In the fourth grade, a Comprehensive Tests of Basic Skills (CTBS) test was administered rather than the MAT test, and the composite battery percentage was 71. After the injury in the fifth grade, Christopher's overall percentile dropped to 45%, still "within the norm." (Mateer Dep. at 87-88.) In the sixth grade, however, his test results dropped dramatically. In fact, it was "beyond" what Dr. Mateer said she would have expected. Accordingly, she did not have an explanation for the decline in the sixth grade achievement test. She concluded the decline "may have been related to attentional memory, motivational or emotional factors. I just don't know." (Mateer Dep. at 91.)
On July 9, 1993, about one year post accident, Dr. Mateer's staff tested Christopher. The testing took several hours, and during the testing, "[h]e appeared to interact appropriately, appeared to put forth good effort, seemed to work diligently on task presented. He was quite quiet. Not very much spontaneous speech, although he did answer questions and did respond appropriately." (Mateer Dep. at 44.) That is, he presented normally and seemed to understand the instructions given. (Mateer Dep. at 44.)
The test results were consistent with those of other children who had suffered frontal lobe injury. Although Dr. Mateer testified no individual test can indicate a child is brain impaired, a review of all the tests administered can indicate the potential effects of a brain injury. (Mateer Dep. at 51.) The evaluator
[L]ooks at the constellations and profiles of strengths and weaknesses. And the purpose of neurophysiological assessment is to compare domains of cognitive ability in reference to a standard such as a general intellectual capacity and look at how different domains of cognitive function are related to that. What I can tell you is that a child of average intelligence would never perform this poorly on measures sensitive to attention and memory.
(Mateer Dep. at 52.)
Dr. Mateer opined Christopher scored within normal range on measured intelligence, the K-BIT (Kaufman Brief Intelligence Test), and he scored within normal range on the trail making test; the sentence imitation, word sequence and oral direction subtests of the Detroit Test; the Taylor Complex Figure; the Individual Achievement Test; the Wechsler Reading Comprehension and Listening Comprehension; and the Hooper Visual Organization test. She noted these tests reflected the basic integrity of his language system, his visual perception system, and revealed maintenance of average range IQ and academic achievement. (Mateer *1495 Dep. at 53.) With respect to the Attention Capacity Test, she concluded Christopher was "significantly impaired," saying there were not 10% of children with an average IQ who would perform as poorly as he did on the test. (Mateer Dep. at 55.)
Dr. Mateer admitted that a child can suffer from attentional capacity problems without necessarily being brain-impaired; e.g., severe depression has been associated with attention capacity difficulties. (Mateer Dep. at 58.) She opined that the death of a child's mother could result in emotional problems of the nature and degree that might cause these attention difficulties. (Mateer Dep. at 59.) Another stressor which could result in attention deficit would be the criminal prosecution and sentencing of a close family member. (Mateer Dep. at 60.)
Dr. Mateer noted the sound and visual symbol recall test also demonstrated impairment because over a span of time, Christopher's ability to recall fell dramatically. (Mateer Dep. at 64.) She also concluded the level of learning subtest of the auditory verbal learning test demonstrated impairment.
She considered Christopher's scoring under the paragraph copy test to be abnormal and, although not a localizing test, to be consistent with frontal lobe impairment. She considered his reading speed to be below his age expectation. (Mateer Dep. at 68.) She rated the attention deficit disorders evaluation scale with low percentiles, thus considering them below normal. These scores, however, are based upon the subjective history as related by Mr. Chapple to Dr. Mateer and are wholly dependent upon the accuracy of the history reported. (Mateer Dep. at 69.) Dr. Mateer noted:
[T]here are likely some psychogenic factors related to the loss of a parent, and readjustment to life without that parent, as well as now to remarriage and combining of families, but I think that the impact on the cognitive and behavior functioning of Chris of those factors is difficult. I would have to say it's difficult to determine, but I believe that his cognitive abilities and the nature of his behavior changes is fully explainable and accountable and consistent with the nature of his brain injury.
(Mateer Dep. at 71-72.)
Dr. Mateer disagreed with Dr. Domitor's conclusion that Christopher's cognitive impairment is mild; rather she thought some of the "deficits are at least moderate." (Mateer Dep. at 76.)
Dr. Mateer concluded the bulk of Christopher's recovery has been made. She concluded he is likely to be left with permanent residual problems with attention, memory and executive functions. She believed that, with appropriate support within the school setting, as well as counselling, academic and cognitive support, he should be able to complete high school; without such support, he would be at high risk for dropping out. She also noted the major focus of therapy should be to teach use of the compensatory strategies to help him acquire an understanding of his personal deficits, enabling him to improve his coping skills. However, she also noted it is more difficult to teach children because they do not have a previously fully-developed system. (Mateer Dep. at 86.)
When asked on a more probable than not basis to a reasonable degree of neuropsychological certainty, whether these remediation programs would be successful, she said she did not believe anything was going to make Christopher's problems go away. She concluded the remedial programs will be "critical and necessary to him to provide him with support and assist in monitoring and the kind of environmental controls to allow him to move forward the best he can." (Mateer Dep. at 87.) When asked on the same basis, whether Christopher was going to be employable, she concluded he was at a "much higher risk for difficulties with employment and that there may well be various employment he would have been capable of performing that he will clearly not be now." (Mateer Dep. at 87.)
Dr. Mateer opined Christopher was an example of how easy it was to overlook or misinterpret the fact he had been brain injured. On one hand, his vocabulary, his kind of "basic sustained simple attention," and his visual, spacial, and language skills were consistently tested above the 50th percentile and *1496 as high as the 75th percentile for verbal IQ and vocabulary knowledge. However, when reviewing scores involving attention, concentration, new learning and memory, he fell below the 25th percentile. Thus, there is some indication of impairment. (Mateer Dep. at 98.)
Characteristic of this type of impairment, are persons with problems involving low self esteem, motivation, self-confidence and organizational skills. (Mateer Dep. at 99.) She concluded Christopher has suffered frontal brain injury and reflected "continuing problems secondary to that frontal image." (Mateer Dep. at 101.)
In contrast to Plaintiff's evidence, Defendants argue Christopher does not have a permanent brain injury, but that the problems which are manifested now could have been predicted based upon Christopher's school history before the accident, particularly his declining academic performance and increasing problems with behavior. Defendants also attribute Christopher's current problems to the death of his mother and his father's remarriage and the adjustments inherent in blending families. Defendants' arguments are based on evidence Christopher had no behavioral problems while visiting his sister in New York on two occasions and Christopher's own statement that his grades are improving and that he enjoys school. Defendants' also offer the testimony of medical experts, Patrick S. Lynch, M.D., and Ralph M. Reitan, M.D.
Dr. Lynch, a consultant in neurosurgery and neurology, reviewed the history of Christopher's injury and the clinical findings after the injury, including the CT scan. Based on that history, Dr. Lynch opined Christopher would make a full, uncomplicated recovery without any demonstrable neurological deficits. He noted if there was some permanent loss of brain tissue from the accident secondary to the hemorrhages in the frontal lobes, the loss of tissue would, accordingly to CT scans, be relatively small in comparison to the total mass of white matter in the frontal lobe. Additionally, the cortical brain cells that transmit through this dead area would seek other roots and transmit impulses to other brain cells nearby, thus bypassing the damaged areas. Children are more likely to develop this type of compensation because the brain is not fully developed. Dr. Lynch also referred to his clinical practice where he has observed many patients make a full recovery from what appeared to be a severe brain injury.
Plaintiff contends Dr. Lynch's testimony does not meet the evidentiary requirements of Daubert v. Merrell Dow Pharmaceuticals, Inc., ___ U.S. ___, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).[14] Having reviewed Dr. Lynch's opinion under the Daubert criteria, the court accepts Dr. Lynch's testimony. Of significance is the fact, Dr. Lynch's testimony is based on his personal observations involving patients he has treated over the years.
*1497 There is no Daubert challenge to the testimony of Ralph M. Reitan, Ph.D., although Plaintiff does argue that Dr. Reitan's methodology is viewed by some experts as outdated. Dr. Reitan reviewed Christopher's history, his raw test scores administered under Dr. Domitor's direction, reports by Dr. Mateer and raw test data, as well as Christopher's school records. Dr. Reitan administered most of the Halstead-Reitan Neuropsychological Test battery for older children. He noted that most of the test scores fell in the normal range. Dr. Reitan also concluded, however, that there were certain mild deviations that could be of significance regarding minor brain dysfunction. (Reitan Report at 2.) In Dr. Reitan's report he noted:
Some scores are very good; some scores are below normal; most scores are in the average range. This is exactly what happens with normal (non brain-damaged) children. In terms of the objective test results, Chris appears to be essentially normal. Nevertheless, from a clinical point of view, I would postulate that there might be some very mild left cerebral deficits and that Chris might be having more trouble in school as a result. If brain impairment of a very mild nature is present, it would be compatible with head trauma.
(Reitan Report at 2.) It was noted the poorest scores were on the Tactual Performance Test-Localization (TPT-L) and Grip Strength. Dr. Reitan concluded a serious error had been made in test administration of the TPT-L, rendering the score invalid. As to the grip strength, it was not indicative of intellectual or cognitive abilities.
Dr. Reitan rejected Dr. Domitor's conclusions, finding fault with his reliance on the mazes test and picture arrangement subtest as being indicative of frontal lobe injury. (Reitan Report at 4.) Dr. Reitan noted that Dr. Domitor may have relied on results from adult literature and incorrectly applied these results to a child. This was incorrect, in Dr. Reitan's view, because children have not yet developed their brain-related abilities to a full extent.
Dr. Reitan compared Christopher's scores to those scores of normal and brain-damaged children. Although there was a significant difference, Christopher's scores were, for the most part, higher than the normal controls on nine of the 18 tests and nearly identical scores on four more. His scores clearly were lower than either group on the TPT-L and grip strength as discussed earlier. (Reitan Report at 6.)
Dr. Reitan also rejected Dr. Mateer's assessment, as it was not what he described, a "neuropsychological" examination, but instead "was the kind of ability and cognitive testing that might be used to assess a normal child." (Reitan Report at 9.) Christopher's test results were never compared with those of brain-damaged children, with the single exception of the Trail Making test, one developed by Dr. Reitan. (Reitan Report at 11.) In contrast, under the Reitan method, the standard scientific procedure for developing neuropsychological tests is to perform research on brain-damaged and normal controls and then to determine how the test results differ. The results of the research on these two groups then must be correlated and compared with the results of the individual subject. Finally, Dr. Reitan suggests Dr. Mateer may have been biased by her knowledge of the circumstances that led to the testing, including the history of head injury. (Reitan Report at 16.) Dr. Reitan espouses making conclusions first and then corroborating those conclusions by reviewing the subject's history.
Dr. Reitan also reviewed Christopher's academic history, noting his grades were in a steady decline from second through fourth grade. In Dr. Reitan's view, the Bs, Cs and Ds earned in fifth grade may have been a continuation of the trend. Christopher's behavior scores also improved following the first year of the injury. His scores on the CTBS administered the year after injury were closely in line with an expectation based on his IQ. (Reitan Report at 19.) Finally, Dr. Reitan notes that the significant drop in his MAT scores in 1993, could not be correlated to the recovery pattern noted by children with significant brain injury. (Reitan Report at 19.) Dr. Reitan speculates Christopher may not have been trying hard enough on the tests. Dr. Reitan concluded it is extremely difficult to make predictions regarding *1498 the long-term outcome of children with mild brain damage. (Reitan Report at 22.)
In addition to the medical testimony regarding the possible existence of a permanent medical disability, Defendants also offer evidence regarding the economic prospects of those students graduating from rural high schools. A report on the success of the achievement of youth in rural low-income areas indicates that family influence is the most important factor in educational attainment. The child's own characteristics are second. Based on the educational and vocational history of the Chapple family, only April Chapple has pursued successfully avenues involving higher education. The other two Chapple sons have been involved in retail sales and have advanced through on-the-job training. No one in the Chapple family has a four-year degree, although the court recognizes Peggy Chapple had very high expectations for Christopher in that regard, as she had come to fully appreciate the value of higher education.
Oroville High School statistics reflect that in the Class of 1993, 49 students entered as freshmen and 37 graduated. Of those 37, only 8 were admitted and attended a four-year college. Only one in eight will obtain a four-year degree. Nine others went to trade school and 17 directly into employment. (Moisan Report,[15] App. 3.)
Studies support the conclusion that most people who are raised in a rural area will remain in that area throughout their adult life. Those persons remaining in Okanogan County obtain jobs in fields of mining, orchards, ranching, lumber or construction. (Moisan Report at 6.) Wages in those fields range from $5.25 an hour to $12.40 an hour. Dr. Moisan noted if Christopher successfully completes high school and a trade school, he will be eligible for 74% of the currently identified jobs in the United States.
Based on the evidence, specifically the lack of medical evidence as to long-term prognosis, the court is unable to conclude that Christopher has permanent, organic brain damage. This conclusion is supported by the rapid recovery of his physical symptoms, Dr. Domitor's assessment that Christopher did not need treatment during the first year after the accident, his fifth grade performance, his unremarkable visits to New York,[16] and some indication prior to the accident that his academic performance and behavior patterns were on the decline. In substantial part, the court finds that causation of Christopher's problems during the sixth grade was due to his father's marriage following the death of Christopher's mother, and the adjustment of living with a stepmother and stepbrother, as well as the reaction by the other siblings to the remarriage. The court accepts the test results as they indicate normal scores in most areas. As to those areas which show below normal scores, there is not sufficient scientific evidence to support the conclusion those scores are indicative of permanent organic brain damage in children.
It is noted that sibling April Chapple has left the local job market and resides in New York. Yet, the court also accepts the statistical evidence that students graduating from rural high schools more likely will attend a trade school and obtain jobs in the local market.
The court disagrees with Plaintiff's contention that Christopher will be limited to entry level jobs at a minimum wage level. Rather, the court concludes that after intensive rehabilitation during the remaining years of his minority, Christopher will exhibit, more probably than not, the same success as his stepbrother, Rusty, or his sister. Accordingly, no award is made for lost earning capacity or employment opportunities.
Christopher also claims damages for disability which under the Kirk analysis, is *1499 the loss of the ability to lead a normal life. The court recognizes that life for Christopher has not been "normal" since the accident and, given the recommended rehabilitation and counseling programs, will not be normal for some time to come. Therefore, the court concludes an award of $125,000 is a reasonable sum to compensate him for the time he will spend during the rest of his minority learning to adjust to the changes in his life that were caused by the accident.
Christopher also seeks an award for loss of enjoyment of life. Under the Kirk definition, there has not been sufficient evidence that Christopher is unable to participate in any avocational activities. He is pursuing athletics in school and is capable of traveling throughout the country. Accordingly, no damage award is made for the loss of enjoyment of life.

5. Christopher's Past and Future Pain and Suffering, and Compensation for Fear.

Recovery for pain and suffering compensates the injured party for the physical and mental discomfort caused by the injury. Kirk, 109 Wash.2d at 461, 746 P.2d 285, citing Thompson v. Nat. R.R. Passenger Corp., 621 F.2d 814 (6th Cir.), cert. denied, 449 U.S. 1035, 101 S.Ct. 611, 66 L.Ed.2d 497 (1980). Given the length of his hospitalization, the severity of his injuries, and the rehabilitation Christopher must undergo, the court concludes a sum of $325,000 is appropriate. Additionally, under the same analysis used in the survival claim, Christopher is to be awarded $30,000 for the fear he experienced immediately before the accident.

6. Set-Off.

Defendants represent advancement of an undisputed $83,000 to Plaintiffs, including $6,000 for funeral expenses and $3,880 for property damage. That amount shall be set off against the final judgment. Accordingly,
IT IS ORDERED:
1. Plaintiffs are awarded judgment against Defendants, jointly and severally as follows:

A. Estate of Peggy Chapple:
 Funeral Expenses $ 6,000
 Chapple Vehicle 3,880
 Fear 25,000
 Net Loss of Earning 198,288
 _________
 Total Award to Estate of Peggy Chapple: $233,168
B. Wrongful Death ClaimsAdult Children:
 Rusty Chapple $60,000
 Greg Chapple $60,000
 April Chapple $60,000
C. Christopher Chapple:
 Wrongful Death Claim $160,000
 Tort Claims:
 Past Medical $ 29,013
 Future Medical $124,000
 Temporary Disability $125,000
 Pain and Suffering $325,000
 Fear $ 30,000
 _________
 Total Awarded to Christopher Chapple: $793,013
D. Michael Chapple:
 Wrongful Death Claim $75,000

*1500
 Tort Claim:
 Parent-Child Consortium 30,000
 ________
 Total Awarded to Michael Chapple: $ 105,000
 __________
TOTAL JUDGMENT BEFORE SET-OFF $1,311,181
 Set Off ($83,000)
TOTAL JUDGMENT AFTER SET-OFF $1,228,181

Plaintiffs also are awarded their reasonable costs.
2. The Clerk shall enter this Order, provide a copy to counsel for Plaintiffs and Defendants and arrange for return of exhibits to parties. Judgment shall be entered for Plaintiffs and the file closed.
NOTES
[1] The court commends the parties and counsel for agreeing to address the issues in this matter through a summary bench proceeding. Not only did proceeding as stipulated result in a savings of expense and time to the parties and to the court, but in addition, and more importantly, addressing the issues under the stipulation exposed the Chapple family to fewer hours of reliving the tragic events forming the basis of Plaintiffs' claims.
[2] RCW 4.20.060 provides:

No action for a personal injury to any person occasioning death shall abate, nor shall such right of action determine, by reason of such death, if such person has a surviving spouse or child living, including stepchildren, or leaving no surviving spouse or such children, if there is DEPENDENT upon the deceased for support and resident within the United States at the time of decedent's death, parents, sisters or brothers; but such action may be prosecuted ... by the executor or administrator of the deceased.
[3] The modified calculation appears as follows:

Expected annual earnings $ 18,000
Collection periodyears × 16.2
 ________
Expected worklife earnings $291,600
Consumption factored at 32% - 93,312
 ________
Net loss of earnings $198,288

[4] RCW 4.20.010 provides:

When the death of a person is caused by the wrongful act, neglect or default of another his personal representative may maintain an action for damages against the person causing the death.
[5] In so concluding, it is noted that $160,000 is more than the amount suggested by counsel. Yet, a review of awards in other cases for loss to a minor child of parental consortium following wrongful death reveals this amount to be within the range of an average award, if the term "average" could ever be used when describing such a tragic loss.
[6] "Ecchymosis" is the medical term for a bruise. American Medical Association, Encyclopedia of Medicine, 1989, at 387.
[7] Conjugate gaze refers to eyes which focus together rather than pointing in different directions. (Moise Dep. at 32.)
[8] Tests that were administered included the Aphasia Screening, Benton Visual Retention, Draw-a-Bicycle and Clock Category, Rey Complex Figure Drawing, Lateral Dominance, Manual Finger Tap, Sensory Perceptual, Tactual Performance, Verbal Fluency, WRAT-R, Woodock-Johnson Selected Subtests, Draw a Family, Draw a Person, Group Peg Board, Incomplete Sentences, Knox Cube, Peabody Picture, Vocabulary, Ruff Figure of Fluency, Stroop, Symbol-Digit Modalities, WISCX-R, Wisconsin Card Sorting, Trails, Speech, Sounds, Perceptions and Seashore Rhythm. (Reitan Dep. at 61.)
[9] Dr. Domitor suggested Mediplex in Mountlake Terrace or the Center for Cognitive Rehabilitation in Puyallup. (Domitor Dep. at 177.)
[10] Those expenses reimbursed are for the following amounts:

Oroville Emergency Aid $ 157.00
North Valley Hospital 1,934.41
North Valley Family Med. 399.80
Lifeline Ambulance, Inc. 218.60

Deaconess Medical Center $16,884.89
Dr. John Demakas 1,306.00
Dr. Vivian Moise 636.21
P.T. Works 140.00
Spokane Radiology Consultants 416.00
Dr. Paul Domitor 2,499.00
Robert F. Nevins/Jean Williams 4,520.89
 __________
TOTAL $29,013.00

[11] The court accepts the total offset method used by Plaintiff's expert; thus, the damages awarded for future medical expenses will not be reduced.
[12] Neuropsychologist Dr. Catherine Mateer defined "executive functions" as "a broad range of skills and functions that are known to be sensitive to frontal lobe functioning. It includes such things as being able to initiate or start behaviors, being able to set goals, to anticipate consequences of one's actions, to seek and organize one's self, and to be able to respond to environmental and social constraints. It really incorporates a range of both cognitive and psychosocial behavior phenomena." (Mateer Dep. at 92.)
[13] The history taken by Dr. Mateer was inconsistent with the one taken by psychologist Dr. Roubos during Christopher's hospitalization to the extent that Dr. Roubos noted from talking to Christopher's father that Christopher was "somewhat spoiled and demanding." (Roubos Dep. at 36.) Dr. Roubos also reported Christopher's pre-accident history as Christopher being a "little hyper with a tendency to act out." (Mateer Dep. at 38.)
[14] Daubert provides factors for the court to consider in determining whether expert testimony is based on "good" science. Rather than making it more difficult to admit expert scientific and technical testimony into evidence, Daubert purports to liberalize the standard for admission. In abolishing the "general acceptance" standard of Frye v. United States, 54 App.D.C. 46, 47, 293 F. 1013, 1014 (1923), the Daubert Court recognizes that scientific or technical theories which are grounded on valid scientific principles are admissible even though perhaps not "generally accepted" as relevant and reliable in the scientific community. The court recognizes that it takes time for new and innovative theories to become "generally accepted." General acceptance is a factor to be considered; however, it is not dispositive.

The focus is on the "methodology" of the experts, and not the conclusions which they generate. Daubert, ___ U.S. at ___, 113 S.Ct. at 2797. This does not mean, however, that a conclusion will be admissible merely because some part of the methodology is scientifically valid. The entire reasoning process must be valid. Daubert, at ___, 113 S.Ct. at 2796. A credible link must be established between the reasoning and the conclusion. Once that is accomplished, the inquiry crosses the line from one of admissibility to one of the weight the trier of fact should accord to the conclusion.
A distinction also must be made between the methodology and qualifications. An expert may be "qualified" to render an opinion, but the methodology may be suspect. Whether a determination can be made that an expert has used reliable methodology, but that the expert is not "qualified" seems unlikely, although perhaps not inconceivable. The undersigned believes there are three separate areas of inquiry: qualifications, methodology, and conclusions. In making inquiry into these areas, it is important not to blur the lines between admissibility and weight of the evidence.
[15] Plaintiff challenges the testimony of Dr. Moisan, arguing it does not meet the Daubert standard as that testimony relates to Dr. Moisan's opinion that Christopher will enter the job market in Okanogan County in the mining field. The court agrees this is Dr. Moisan's personal opinion and is unsupported by any scientific analysis. However, the court does not rely on this specific conclusion in making its findings.
[16] The court notes April Chapple testified in her deposition that Christopher did not have behavioral problems during his visits with her in New York. (April Chapple Dep. at 19-20.) This was so, although April Chapple also stated she had noticed changes in Christopher, specifically that he appeared depressed and seemed to be frustrated. (April Chapple Dep. at 24.)